Wayne D. Carroll, (Bar No. #024120)
The Carroll Law Firm PLC
42104 N. Venture Court, Suite E-101
Anthem, AZ 85086
P. (623)551-9366; F. (623) 551-7970
Copyright@AnthemLawFirm.com
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA - PHOENIX

| | |
|---|---|
| PATRICK COLLINS, INC.,<br><br>                  Plaintiff,<br><br>  v.<br><br>DOES 1 ─ 57,<br><br>              Defendants. | **COMPLAINT FOR COPYRIGHT<br>INFRINGEMENT<br>AND<br>DEMAND FOR A JURY TRIAL**<br><br>Case No.: _____<br><br>Judge: _____ |

Plaintiff PATRICK COLLINS, INC., dba Elegant Angel. Inc., ("Plaintiff") for its Complaint against Defendants Doe 1 through Doe 57 (collectively referred to as "Defendants"), alleges as set forth below.

### NATURE OF THE CLAIM, JURISDICTION AND VENUE

1.    This is an action for copyright infringement under the United States Copyright Act, 17 U.S.C. §§ 101 etc. This Court has jurisdiction under 17 US.C. §101 *et*

*seq.*, 28 US.C. § 1331 (federal question), and 28 US.C. § 1338(a) (copyright).

2.      Venue in this District is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a). Although the true identity of each Defendant is unknown to the Plaintiff at this time, on information and belief, each Defendant may be found in this District (*see Exhibit D, listing the believed State of Residence for each John Doe*) and a substantial part of the alleged events occurred and have a significant effect within this District. Plaintiff has used its best efforts to ensure that all Defendants identified reside or can be found in the geographic area of this Court. As explained below and in the attached *Declaration of Jon Nicolini*, Plaintiff has used its best efforts to identify Defendants only in the geographic location of the Court, and has cross-referenced the data with commercially available databases to ensure that all Defendants reside in the District. Such technology to identify the location of such Defendants is considered very accurate, but not necessarily accurate in all cases.

3.      On information and belief, personal jurisdiction in this District is proper because each Defendant, without consent or permission of Plaintiff as the exclusive rights owner, intentionally and willfully distributed, and offered to distribute over the Internet, copyrighted works for which Plaintiff has exclusive rights. In addition, each Defendant contracted with an Internet Service Provider (ISP) found in this District to provide each Defendant with access to the Internet. Therefore, venue in this Court is proper in accordance with 28 U.S.C. §§ 1391(b) and 1400(a).

4.      To ensure that venue and jurisdiction are proper, Plaintiff, through its agents

and representatives, has undertaken efforts to only identify alleged infringers who are within or near the geographic location of the Court. *See attached Declaration of Jon Nicolini, Exhibit B*; *see Listing of the believed State of Residence for each John Doe, Exhibit D.*

## JOINDER

5.     Pursuant to Fed.R.Civ.P. 20(a)(2), the United States Supreme Court's ruling[1] and the Court of Appeals for the Ninth Circuit's ruling[2], the Defendants have been properly joined, as set forth in detail below and in Exhibit B, because Plaintiff alleges that all Defendants have cooperated together and with others to trade (uploaded and downloaded) the exact same file of the copyrighted works in related transactions through torrent software. The Defendants' IP addresses were identified through the use of forensic software. Plaintiff, through its agents and representatives, has taken steps to confirm that all Defendants have in fact engaged in a series of related transactions or occurrences. All Defendants' IP addresses identified in Exhibit A (i) have traded exactly the same file of the copyrighted work as shown by the identical hash mark; (ii) have traded (simultaneously uploaded and downloaded) the exact same file as is the nature of torrent

---

1  *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 724, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Under the rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.")

2  *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency,* 558 F.2d 914, 917 (9th Cir. 1997) ("permissive joinder is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits.")

software; and (iii) the alleged events occurred within a limited period of time. *See attached Declaration of Jon Nicolini, Exhibit B*. Further, Plaintiff has used its best efforts to only identify Defendants who are within the geographic location of the Court, as explained in the Complaint and the *Declaration of Jon Nicolini*. *See attached Declaration of Jon Nicolini, Exhibit B*; *see also Listing of the believed State of Residence for each John Doe, Exhibit D.*

## GENERAL ALLEGATIONS

6.    Plaintiff PATRICK COLLINS, INC., is a corporation duly formed and existing under the laws of California, and has a principal place of business at 8015 Deering Ave., Canoga Park, CA 91304

7.    The true names of Defendants are unknown to the Plaintiff at this time. Each Defendant is known to Plaintiff only by the Internet Protocol ("IP") address assigned to that Defendant by his, her or its Internet Service Provider on the date and at the time at which the infringing activity of each Defendant was observed. The IP address of each Defendant, together with the date and time at which his, her or its infringing activity was observed and the hash value of the file, is included on **Exhibit A** which is attached hereto. The technology used to identify each Defendant is explained in **Exhibit B.** On information and belief, Plaintiff states that information obtained in discovery will lead to the identification of each Defendants' true names and addresses and will permit Plaintiff to amend this Complaint to state the same.

8.    The Motion Picture "Real Female Orgasms 13." (the "Motion Picture") was

produced by Plaintiff and released on December 6, 2010. The copyright was registered in April of 2011, the Copyright Registration Number is PA0001740861 (Registration Date: 2011-04-06). **See Exhibit C.** It is offered as a DVD through various vendors, including www.cduniverse.com for $19.19, and as "view on demand."

9.      The torrent protocol makes home computers with low bandwidth capable of participating in large data transfers across so-called "Peer-to-Peer" (P2P) networks. The first file-provider decides to share a file ("seed") with a torrent network. Then other users ("peers") within the network connect to the seed file for downloading. As additional peers request the same file, they become part of the same network. Unlike a traditional P2P network, each new peer receives a different piece of the data from each peer who has already downloaded the file. This system of multiple pieces of data coming from peers is called a "swarm." As a result, every downloader is also an uploader of the illegally transferred file and is simultaneously taking copyrighted material through many ISPs in numerous jurisdictions around the country.

10.     Once a participant in these downloading and uploading transactions becomes a peer, the software reassembles the file and the peer can view the Motion Picture. Once a peer has downloaded the complete file, that peer becomes an additional seed because he or she continues to distribute the torrent file (here: the copyrighted work).

11.     In this case, all Defendants have not only swapped the same copyrighted work, they have swapped the exact same file. The devices connected to all IP addresses

identified in Exhibit A have utilized the same exact hash mark (a 40-character hexadecimal string which through cryptographic methods clearly identifies the Release, comparable to a forensic digital fingerprint) which establishes them as having taken part in the same series of transactions. All alleged infringers downloaded the exact same copyrighted work while trading in the same torrent.

12.     While Defendants engaged in this downloading and uploading of the file, they exposed their IP address to the public. With torrent software, one can see the IP address of the various computers that one is connected to, and which are sharing files in cooperation with, one's own computer.

13.     Through the use of torrent technology, the Defendants in this case engaged in deliberate distribution of unlawful copies of the Motion Picture. Moreover, the Defendants in this case engaged in a series of related transactions, because they all downloaded the exact same file (not just the same copyrighted work), within a limited period of time. Furthermore, because of the nature of torrent software, they engaged in a series of related transactions because in order to download a movie (or parts of it), one must permit other users to download or upload the file from one's own computer. Thus, the Defendants were simultaneously trading (downloading and uploading) the exact same file during a limited period of time.

14.     By using geo-location technology and referencing the tracking data with other databases, Plaintiff has attempted to ensure that the IP addresses are likely within the geographic location of the Court. *See attached Listing of the believed State of*

*Residence for each John Doe, Exhibit D.*

Plaintiff has used its best efforts to only identify Defendants who are within the geographic location of the Court, as explained in the Complaint and the *Declaration of Jon Nicolini*. The time period during which the identified illegal downloads occurred is limited to ensure commonality amongst the Defendants. The Defendants so identified downloaded the identical copyrighted work as part of the same series of transactions or occurrences and are thus specifically and directly related.

## COUNT I

## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. §§ 101 ET SEQ.

15.     Plaintiff repeats and reincorporates herein the allegations set forth in paragraphs 1-14, above.

16.     Plaintiff is a motion picture production company. Plaintiff is, and at all relevant times has been, the owner of the copyrights and the owner of the exclusive rights under the copyrights in the United States in the Motion Picture at issue.

17.     The Motion Picture is an original work that is copyrighted under United States law. The Motion Picture is the subject of a Copyright Registration, and Plaintiff owns that registration. The title of the Motion Picture and its copyright registration number are included in **Exhibit C**. Thus, Plaintiff is entitled to statutory remedies of the U.S. Copyright Act.

18.     Plaintiff has either published or licensed for publication all copies of the

Motion Picture in compliance with the copyright laws.

19.      **Exhibit A** identifies each Defendant (one Defendant per row in the table set out in **Exhibit A**) that has, without the permission or consent of the Plaintiff, reproduced and distributed to the public at least a substantial portion of the Motion Picture. That is, each Defendant listed in **Exhibit A** has, without permission or consent of Plaintiff, reproduced and distributed to the public at least a substantial portion of Plaintiff's copyrighted Motion Picture.

20.      **Exhibit A** also sets out the Internet Protocol ("IP") address associated with each respective Defendant, the identity of the Internet Service Provider (often referred to as an "ISP") associated with the IP address, the last-observed date and time ("Timestamp") that the infringement by that Defendant of Plaintiff's copyright in the Motion Picture was observed and the software protocol used by the Defendant. It also shows the hash value of the file so traded, which shows that each Defendant traded exactly the same file.

21.      Further, Plaintiff is informed and believes that each of the Defendants, without the permission or consent of Plaintiff, has used, and continues to use, an online media distribution system (sometimes referred to as a "peer to peer" network or a "P2P" network) to reproduce at least one copy of the Motion Picture**,** and to distribute to the public, including by making available for distribution to others, copies of the Motion Picture. In doing so, each Defendant has violated, and continues to violate, Plaintiff's exclusive rights of reproduction and distribution protected under the Copyright Act of

1976 (17 U.S.C. § 101 et seq.), including under 17 U.S.C. § 106(1) and (3).

22.     Each Defendant has acted in cooperation with the other Defendants by agreeing to provide, and actually providing, on a P2P network an infringing reproduction of at least substantial portions of Plaintiff's copyrighted Motion Picture, in anticipation of the other Defendants doing likewise with respect to that work and other works. Further in this regard, all the Defendants have engaged in a related series of transactions to engage in unlawful reproduction and distribution of Plaintiff's copyrighted Motion Picture. Each Defendant traded the exact same file.

23.     Each of the Defendant's acts of infringement have been willful, intentional, and in disregard of and with indifference to the rights of Plaintiff. The technology used to identify each Defendant is explained in **Exhibit B.**

24.     Plaintiff has suffered both money damages and irreparable harm as a result of each Defendant's infringement of Plaintiff's copyrights in the Motion Picture. In addition, discovery may disclose that one or more of the Defendants obtained profits as a result of such infringement.

25.     As a result of each Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to monetary relief pursuant to 17 U.S.C. § 504, which may include Plaintiff's damages caused by each Defendant and each Defendant's profits and statutory damages, and to Plaintiff's attorney fees and costs pursuant to 17 U.S.C. § 505.

26.     The conduct of each Defendant has caused, is causing and, unless enjoined

and restrained by this Court will continue to cause, Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, the Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's copyrights and ordering that each Defendant destroy all copies of the copyrighted motion pictures made in violation of the Plaintiffs' copyrights.

## COUNT II

## CONTRIBUTORY INFRINGEMENT

27.     Plaintiff repeats and reincorporates herein the allegations set forth in paragraphs 1-26, above.

28.     Plaintiff is, and at all relevant times has been, the owner of the copyrights and the owner of the exclusive rights under the copyrights in the United States in the Motion Picture at issue.

29.     Through use of torrent software and the process described above, each Defendant copied the constituent elements of the copyrighted work. Further, each Defendant traded not just the same copyrighted work, but the exact same file, as shown by the identical hash value.

30.     By participating in the file swapping with the other Defendants, each Defendant induced or caused or materially contributed to the infringing conduct of the other Defendants.

31.    Each Defendant knew or should have known that other torrent users (Defendants) involved in the file swapping were infringing upon Plaintiff's copyrighted work. Each Defendant directly participated in the series of uploading and downloading of the exact same file and therefore materially contributed to each other Defendant's infringing activities.

32.    Each of the Defendants' contributory infringements were committed willfully within the meaning of 17 U.S.C. § 504(c)(2).

33.    As a result, Plaintiff has suffered damages that were proximately caused by each of the Defendants. Plaintiff has suffered both money damages and irreparable harm as a result of each Defendant's infringement of Plaintiff's copyrights in the Motion Picture. In addition, discovery may disclose that one or more of the Defendants obtained profits as a result of such infringement.

34.    The conduct of each Defendant has caused, is causing and, unless enjoined and restrained by this Court will continue to cause, Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, the Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's copyrights and ordering that each Defendant destroy all copies of the copyrighted motion pictures made in violation of the Plaintiffs' copyrights.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that the Court enter judgment against each Defendant as follows:

A. For a judgment that such Defendant has infringed Plaintiff's copyright in the Motion Picture;

B. For entry of preliminary and permanent injunctions providing that such Defendant shall be enjoined from directly or indirectly infringing the Plaintiffs' rights in the Motion Picture, including without limitation by using the Internet to reproduce or copy the Motion Picture, to distribute the Motion Picture, or to make the Motion Picture available for distribution to anyone, except pursuant to a lawful license or with the express authority of Plaintiffs;

C. For entry of preliminary and permanent mandatory injunctions providing that such Defendant shall destroy all copies of the Motion Picture that Defendant has downloaded onto any computer hard drive or server without Plaintiff's authorization and shall destroy all copies of the Motion Picture transferred onto any physical medium or device in Defendant's possession, custody, or control;

D. For entry of judgment that such Defendant shall pay actual damages and profits, or statutory damages, pursuant to 17 U.S.C. § 504, at the election of Plaintiff;

E. For entry of judgment that such Defendant shall pay Plaintiff's costs;

F. For entry of judgment that such Defendant shall pay Plaintiff's reasonable attorney fees; and

G. For entry of judgment that Plaintiff have such other relief as justice may require and as otherwise deemed just and proper by this Court.

Respectfully submitted this day, March 31, 2012.

FOR THE PLAINTIFF:


By: ___/s/ Wayne Carroll_____
Wayne Carroll (AZ Bar ID 024120)
The Carroll Law Firm, PLC
42104 N Venture Dr. Suite E-101
Anthem, AZ 85086
Phone: (623) 551-9366
Fax: (623) 551-7970
Email:Copyright@anthemlawfirm.com

ATTORNEY FOR PLAINTIFF

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

FOR THE PLAINTIFF:

By:   /s/ Wayne Carroll

Wayne Carroll (AZ Bar ID 024120)
The Carroll Law Firm, PLC
42104 N Venture Dr. Suite E-101
Anthem, AZ 85086
Phone: (623) 551-9366
Fax: (623) 551-7970
Email:Copyright@anthemlawfirm.com

ATTORNEY FOR PLAINTIFF

## <u>VERIFICATION</u>

I, Wayne Carroll, am the attorney who prepared this Complaint. I verify and declare under 28 USC § 1746 that I have read the foregoing Complaint and it is true based on my personal knowledge and the information I have reviewed. In particular, I have taken the following steps to ensure that the Complaint and its allegations comply with all requirements:

1) I have personally discussed in detail the data about alleged infringers (identified by IP address) with officers of Copyright Enforcement Group (CEG) including a technical specialist, Mr. Jon Nicolini, Vice President of Technology and Mr. Kyle Reed, Vice President of Operations. Mr. Jon Nicolini and Mr. Kyle Reed explained the commonality of all identified IP addresses: (a) The devices connected to all IP addresses identified have utilized the same exact hash mark (a 40-character hexadecimal string which through cryptographic methods clearly identifies the Release - comparable to a fingerprint) which corroborates them within the same series of transactions; (b) all alleged infringers downloaded the same file of the copyrighted work while trading in the same torrent; (c) Mr. Jon Nicolini and Mr. Kyle Reed also explained that they made an effort to create a list of alleged infringers who are located within the jurisdiction of the court where the Complaint is to be filed by using geo-location technology; (d) Mr. Jon Nicolini and Mr. Kyle Reed specifically limited the time period during which the investigated alleged downloads occurred to ensure commonality amongst the alleged infringers. Thus the alleged infringers were likely within the same swarm and engaged in a series of related transactions. The identified IP addresses shared the files around the same time. Mr. Jon Nicolini and Mr. Kyle Reed explained that the alleged infringers so identified downloaded the identical file of the copyrighted work as part of the same series of transactions or occurrences, and are thus related.

2) I particularly inquired into the issue of the relationship among the alleged infringers by (i) researching the functioning of torrent technology, and (ii) interviewing CEG personnel. CEG Personnel explained that the alleged infringers in this case engaged in a series of related transactions, because they all downloaded the exact same file (not just the same copyrighted work), within a limited period of time. Furthermore, because of the nature of torrent software, they engaged in a series of related transactions because in order to download a movie (or parts of it), one must permit other users to download or upload the file from one's own computer. Thus, the Defendants were

simultaneously trading (downloading and uploading) the exact same file during a limited period of time. While Defendants engaged in this downloading and uploading of the file, they exposed their IP address. With torrent software, one can see the IP address of the various computers that they are connected to, and which are sharing files in cooperation with, one's own computer.

3) Mr. Jon Nicolini and Mr. Kyle Reed further confirmed to me the direct digital connection and relationship among the infringers based on the torrent process and provided the following additional information: The process begins with one user accessing the Internet through an Internet Service Provider ("ISP") and intentionally making a digital file of the work available on the Internet to the public from his or her computer. This first file is often referred to as the first "seed." The person making this seed available as the "original seeder." Persons seeking to download such a work also access the Internet through an ISP (which may or may not be the same ISP as used by the original seeder) and seek out the work on a P2P network. With the availability of the seed, other users, who are referred to as "peers," access the Internet and request the file (by searching for its title or even searching for the torrent's "hash") and engage the original seeder and each other in a group, sometimes referred to as a "swarm," and begin downloading the seed file. In turn, as each peer receives portions of the seed, most often that peer makes those portions available to other peers in the swarm. Therefore, each peer in the swarm is at least copying and is usually distributing, as a follow-on seeder, copyrighted material at the same time. Any BitTorrent client may be used to join a swarm. As more peers join a swarm at any one instant, they obtain the content at even greater speeds because of the increasing number of peers simultaneously offering the content as seeders themselves for unlawful distribution. As time goes on, the size of the swarm varies, yet it may endure for a long period, with some swarms enduring for 6 months to well over a year depending on the popularity of a particular motion picture. That is, each peer (i.e. member of a swarm) in a P2P network has acted and acts in cooperation with the other peers by agreeing to provide, and actually providing, an infringing reproduction of at least a substantial portion of a copyrighted work in anticipation of the other peers doing likewise with respect to that work and other works. Joining a P2P network is an intentional act, requiring the selection by a peer of multiple links to do so.

4) I also inquired into the issue of jurisdiction over the alleged infringers. CEG personnel explained that they make every effort to ensure that all alleged infringers have in fact engaged in a series of related transactions and can thus be properly joined in one lawsuit. Most importantly: (i) CEG has identified only alleged infringers who traded exactly the same file of the copyrighted works at issue (not just the same copyrighted work), as identified by the hash value; and (ii) CEG has limited the time period during which they searched

copyright infringements; in addition, (iii) CEG has limited the geographic search to ensure as much as technically possible that the alleged infringers are in fact within the geographic area of the court. However, because of intermediary ISPs and the location of the ISPs technical facilities, the location cannot always be exactly pinpointed.

5) I personally conducted a random batch test of the purported locations of the IP addresses in Exhibit A to ensure that the Defendants likely reside within the jurisdiction of the Court or can be found there, or a substantial part of the events alleged occurred or had an effect within the jurisdiction of the Court. I checked the locations through the IP locators at http://www.ip-address.org or http://www.arin.net or http://www.ipligence.com. During my search, I did not find any IP addresses that were outside the geographic area of the Court. However, I know that such location checks are not absolutely accurate in all circumstances. For example, because my personal checks were conducted after the file swapping took place, the IP address may have changed. However, I have used my best efforts to ensure that all Defendants are in fact residents of the State and within the geographic location of the Court.

6) I personally checked that a copyright registration for the work at issue has been filed properly through the searchable database of the U.S. Copyright office at http://copyright.gov/records/, to ensure that the work at issue is eligible for statutory remedies under Section 412 of the Copyright Law.

Thus, I verify and declare under penalty of perjury that the foregoing statements and the statements in the Complaint are true and correct to the best of my knowledge.

Date: March 31, 2012

_/s/ Wayne Carroll_
Wayne Carroll

**EXHIBITS:**

Exhibit A – Table of Last-Observed Infringements by Defendants of Plaintiff's Copyright in the Motion Picture.

Exhibit B – Technology Declaration of Mr. Jon Nicolini, explaining the technology used to identify the alleged copyright infringers.

Exhibit C – Copyright registration record of the Motion Picture at issue.

Exhibit D – Believed State of Residence for each John Doe

Exhibit A – Table of Last-Observed Infringements by Defendants of Plaintiff's Copyright in the Motion Picture.

**Exhibit A**

Table of Last-Observed Infringements by Defendants of Elegant Angel Inc's Copyright in the Motion Picture "REAL FEMALE ORGASMS 13,"
Copyright Reg. No. PA0001740861

| Defendant | Internet Protocol Address (IP) | Timestamp (U.S. Eastern Time) | Internet Service Provider (ISP) | Protocol | Hash |
|---|---|---|---|---|---|
| Doe 1 | 107.2.17.46 | 2011-11-18 03:14:07 -0500 | Comcast Cable | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 2 | 174.18.32.144 | 2011-12-03 15:03:07 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 3 | 174.19.185.214 | 2011-12-14 15:03:57 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 4 | 174.26.136.158 | 2011-12-14 10:46:22 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 5 | 174.26.150.208 | 2011-12-13 15:11:14 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 6 | 174.26.156.248 | 2011-12-15 12:20:25 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 7 | 174.26.95.50 | 2011-11-29 03:01:43 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 8 | 24.251.192.225 | 2011-12-03 15:05:51 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 9 | 24.251.194.199 | 2011-11-29 15:02:02 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 10 | 63.230.195.27 | 2012-01-10 15:43:38 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 11 | 63.230.203.214 | 2011-12-30 07:28:51 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 12 | 67.1.11.97 | 2011-11-17 13:02:08 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 13 | 68.0.167.226 | 2012-01-11 00:29:31 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 14 | 68.104.196.226 | 2011-11-22 09:52:06 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 15 | 68.110.118.96 | 2012-01-13 11:30:43 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 16 | 68.110.127.70 | 2012-01-01 14:17:59 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 17 | 68.110.83.80 | 2011-12-10 16:06:07 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 18 | 68.2.172.29 | 2012-01-01 07:53:48 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 19 | 68.2.192.32 | 2011-11-26 17:50:00 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 20 | 68.2.25.132 | 2012-01-07 19:18:34 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 21 | 68.225.193.130 | 2012-01-07 00:31:39 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 22 | 68.225.196.20 | 2011-12-26 22:42:08 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 23 | 68.227.249.86 | 2011-11-21 17:10:42 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 24 | 68.228.42.103 | 2012-01-05 01:50:29 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 25 | 68.230.24.109 | 2012-01-04 06:08:59 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 26 | 68.230.67.26 | 2011-11-24 20:11:09 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 27 | 68.231.70.100 | 2012-01-04 00:59:44 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |

| Doe 28 | 68.231.92.41 | 2012-01-15 06:26:16 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
|--------|--------------|---------------------------|--------------------|------------|------------------------------------------|
| Doe 29 | 69.244.44.177 | 2011-12-30 11:13:48 -0500 | Comcast Cable | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 30 | 70.162.240.46 | 2011-12-06 05:55:48 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 31 | 70.162.81.120 | 2011-12-09 08:56:07 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 32 | 70.164.248.120 | 2011-12-30 13:23:58 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 33 | 70.176.15.188 | 2011-12-12 17:29:33 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 34 | 70.176.51.56 | 2011-11-27 22:25:08 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 35 | 70.184.75.68 | 2012-01-03 20:56:29 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 36 | 70.190.127.16 | 2011-11-18 19:34:57 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 37 | 70.190.166.97 | 2012-01-05 13:44:45 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 38 | 70.190.36.132 | 2011-12-14 22:38:20 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 39 | 70.190.38.161 | 2012-01-13 12:40:25 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 40 | 70.59.229.203 | 2011-12-13 16:38:43 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 41 | 71.209.177.64 | 2011-11-22 03:00:19 -0500 | Qwest Communications | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 42 | 71.226.59.77 | 2011-11-17 21:10:56 -0500 | Comcast Cable | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 43 | 71.228.152.137 | 2012-01-07 08:19:52 -0500 | Comcast Cable | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 44 | 72.201.72.46 | 2011-12-06 18:02:03 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 45 | 72.208.10.168 | 2012-01-04 00:55:26 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 46 | 72.208.154.3 | 2011-12-12 21:15:05 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 47 | 72.208.35.14 | 2011-11-17 20:11:09 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 48 | 72.211.159.222 | 2011-11-24 02:12:17 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 49 | 72.223.77.241 | 2011-11-26 02:16:57 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 50 | 98.165.174.49 | 2012-01-14 02:47:37 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 51 | 98.165.235.36 | 2011-12-14 23:27:14 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 52 | 98.165.75.199 | 2012-01-06 21:11:27 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 53 | 98.165.84.104 | 2012-01-02 00:12:53 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 54 | 98.165.88.115 | 2011-12-01 20:22:14 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 55 | 98.167.148.47 | 2011-11-29 23:33:28 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 56 | 98.177.248.40 | 2011-12-19 03:51:10 -0500 | COX COMMUNICATIONS | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |
| Doe 57 | 98.225.101.24 | 2012-01-14 21:12:01 -0500 | Comcast Cable | BitTorrent | 2a6cfb2e072ffc948933b3349fb996fa4058d5a1 |

Exhibit A, Page 2 of 2

Exhibit B – Technology Declaration of Mr. Jon Nicolini, explaining the technology used to identify the alleged copyright infringers

Wayne D. Carroll, (Bar No. #024120)
The Carroll Law Firm PLC
42104 N. Venture Court, Suite E-101
Anthem, AZ 85086
P. (623)551-9366; F. (623) 551-7970
Copyright@AnthemLawFirm.com
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA - PHOENIX

| | |
|---|---|
| PATRICK COLLINS, INC., | Case No.: _____ |
| Plaintiff, | |
| v. | **DECLARATION OF JON NICOLINI** |
| DOES 1 — 57, | |
| Defendants. | Judge: _____ |

I, Jon Nicolini, declare as follows:

1.    I am the Chief Technology Officer of Copyright Enforcement Group, LLC ("CEG").

2.    CEG's address is 8484 Wilshire Boulevard, Suite 220, Beverly Hills, California 90211.

3.    CEG is in the business of discovering infringements, and arranging for the enforcement, of the copyrights of its clients.  Plaintiff in this case is a client of CEG.  Based on information provided to me, I state that Plaintiff Patrick Collins, Inc. is a motion picture creator and distributor, and the motion picture named in the Patrick Collins, Inc. Complaint (hereinafter the "Work") is among the motion pictures whose copyrights are the subject of the CEG's efforts.

4.    Music and motion picture piracy (i.e., the unauthorized copying and/or distribution of songs and motion pictures) has been a problem since the advent of home audio and video devices.  The problem continued with the introduction of home CD and DVD players.

1

An article describing the problem when CDs and DVDs were a popular way to distribute audio and visual works can be found here:

http://www.thefreelibrary.com/DVD+piracy+in+the+U.S.+becomes+an+industry-a0103403775 (attached to this Declaration as **Exhibit 1**)

Today, piracy has increased dramatically with the ability to store digital files of songs and motion pictures in the memory of home and/or laptop computers, as well as other devices such as iPads and iPhones.  (In this Declaration, the term "computer" is, unless otherwise stated, meant to refer to any device or system that may store data and communicate on the Internet.  Common examples of computers include, but are not limited to: desktop computers, laptop computers, tablet computers, smartphones, electronic readers, media players and even home entertainment systems.) Technology developments over the last several years allow people to distribute such files to each other over the Internet on peer-to-peer networks (sometimes called "P2P" networks) using file sharing software applications such as BitTorrent.   Articles describing aspects of motion picture piracy, as well as piracy of games and books, over P2P networks could be found, at least until recently, at these web pages, among others:

http://www.forbes.com/2009/08/04/online-video-piracy-technology-e-gang-09-movies.html (attached to this Declaration as **Exhibit 2**)

http://www.mpaa.org/resources/8aaaecf5-961e-4eda-8c21-9f4f53e08f19.pdf (attached to this Declaration as **Exhibit 3**)

http://www.forbes.com/2008/09/12/spore-drm-piracy-tech-security-cx_ag_mji_0912spore.html (attached to this Declaration as **Exhibit 4**)

http://reviews.cnet.com/8301-18438_7-20033437-82.html (attached to this Declaration as **Exhibit 5**).

5.      Before explaining how a P2P network, in particular a BitTorrent P2P network, works, I will describe a hypothetical "old school" example of cooperative copyright infringements. While this example is not 100% analogous to P2P infringements, it illustrates in an easy to understand manner how separate people, while committing a series of separate copyright infringements, can cooperate together to expedite the process of making unauthorized copies.  A law student (let's call him or her the "first student") in a law school class of 100 students makes a

2

copy of a casebook, for example <u>Prosser, Wade, Schwartz, Kelly and Partlett's Cases and Materials on Torts, - 12th Edition</u> ("Torts Casebook").  The first student figures that he or she will be lauded for making a copy of that very expensive book and making it available for further copying by classmates.  That first student made a significant investment of money purchasing the Torts Casebook, and spent considerable time in the page by page photocopying from the bound casebook to come up with 1,276 pages of a single-sided copy of the Torts Casebook:



However, what the first student ultimately wants, besides being a "hero" among certain of his/her classmates with respect to the Torts Casebook, is for other people in the class to do the same with respect to the Criminal Law Casebook, the Civil Procedure Casebook, and all the other books. The first student would be getting all books for the year for just the price of one book, while most students partaking in the scheme would be getting all books for free.  In any event, the first student sends out a notice that there will be a book copying event in a certain room, in which stands a free photocopier, for anyone who wants to make a copy of the Torts Casebook. The first student would require, however, that anyone (referred to as a "subsequent student") who wants to leave the room with a copy must leave a copy behind for anyone else who comes to the room seeking to make another copy.  If the copier is a 60 pages per minute copier, each student making a copy of the book from the first student's unauthorized copy would still have to invest just over 21 minutes of time to make a copy, but at over $150 for a new authorized copy of the book or $65 for a used authorized copy (according to Amazon.com on March 6, 2012), the money saved by the subsequent student's engaging in making an unauthorized copy could easily justify the time spent.  The first student has saved the subsequent student a significant amount of time by making a unbound, single-sided copy available as opposed to the authorized bound copy. The time required for each infringement could be significantly decreased if there are multiple photocopiers available and the pages of the first student's unauthorized copy are divided among

3

them.  For example, if four photocopiers are available, the first student's notice could read and look like this,

```
A copy of the Torts Casebook,

Prosser, Wade, Schwartz, Kelly and
Partlett's Cases and Materials on
Torts, - 12th Ed.
is available for you to copy in room
123.

The first 319 pages are in
photocopier 1
Pages 320-638 are in photocopier 2.
Pages 639-957 are in photocopier 3.
Pages 958-1276 in photocopier 4.

Run a copy of each block of pages,
take the new copy
for yourself, and leave the
'original' in each photocopier.
```

The first student might post the notice in the torts classroom, and in any or every room in which the first student would expect classmates to see such a notice.  A subsequent student just starts the photocopiers and less than 6 minutes later scoops up from the photocopiers' output trays a complete copy (1276 pages) of the Torts Casebook.  The next student comes in and puts the four sections of the first student's unauthorized copy of the Torts Casebook back into the respective input trays of the four photocopiers, and repeats the process.  As long as the students cooperate by each making a new unauthorized copy and not merely grabbing the copy that is there, all 99 of the first student's classmates could have a copy of the Torts Casebook in just under 10 hours, with each student's time investment being less than 6 minutes.

4



The photocopy machines are of course mere tools, being useful for a student to innocently make copies of a moot court brief as well for the student to non-innocently make unauthorized copies of the works created by others.  Of course, that "old school" type of copying was and is relatively rare because there was, and is, a significant and obvious risk of being easily caught.

6.      With that "old school" example having been described above, I will now describe how BitTorrent peer-to-peer copying works.  As noted above, BitTorrent peer-to-peer copying is somewhat similar to the "old school" example, and relies even more on cooperation.  It should be kept in mind that just as photocopying a book may not be unlawful–for example, the book may be out of copyright.  Merely using BitTorrent to copy a file is not unlawful if the file being copied is a digital file of a public domain work.

7.      Neither of the two major operating systems for personal computers (i.e., those developed by Microsoft Corporation and Apple, Inc.) nor any of the four most used web browsers, namely, Microsoft Internet Explorer, Mozilla Firefox, Google Chrome and Apple Safari, which are used by well over 90% of users in the United States, include native functionality for peer-to-peer file sharing over the Internet.  Regarding the relative popularity of

5

browsers, see the following articles that could be found, at least until recently, at these web

pages, among others, on the Internet:

> http://gs.statcounter.com/#browser-US-monthly-201103-201202-bar (attached to this
>
> Declaration as **Exhibit 6**)
>
> http://www.statowl.com/web_browser_market_share.php?
>
> 1=1&timeframe=last_3&interval=month&chart_id=4&fltr_br=&fltr_os=&fltr_se=&fltr_cn=&tim
>
> eframe=last_12 (attached to this Declaration as **Exhibit 7**).

Other than Microsoft Internet Explorer and Apple Safari, all other browsers must be intentionally

installed.  Therefore, the original "seeder" and each of the other members of the "swarm" (i.e.,

each of the "peers") must have separately installed on their respective computers special software

that allows peer-to-peer sharing of files by way of the Internet.  (The terms of art, "seeder,"

"peer," "leechers," and "swarm," will be described below.)  The most popular type of peer-to-

peer file sharing utilizes the BitTorrent protocol, in connection with which the seeder and

members of the swarm use software (or applications) known as "BitTorrent clients."  (In this

context, the word "client" means a computer application that works in a BitTorrent environment.)

Among the most popular BitTorrent clients are Vuze (formerly Azureus), µTorrent,

Transmission and BitTorrent 7, although many others are used as well.  In peer-to-peer network

sharing, a "swarm" is a group of seeds and peers sharing a digital file through the same torrent

file.  A "peer" is one of the computers in a swarm sharing the digital file. A "seed" is a complete

copy of the digital file of a work being made available for download.  A "seeder" is either the

computer on which the digital file was originally made available to a swarm, or a peer that has

completed downloading the digital file and is making it available to others. Often, the people

operating the computers are referred to as seeders, or seeds or peers as appropriate.  In addition,

"peers" are sometimes referred to as "leechers" (i.e. a peer that downloads more than it uploads),

though the BitTorrent system is designed for every peer to become a partial seeder once that peer

has received even one piece of the desired digital file.  In any event, the seeder and every other

member of the swarm (i.e., peer) must intentionally install a BitTorrent client (i.e., software

application) onto his/her computer before that computer can be used to join a BitTorrent P2P file

sharing network.

6

8.      P2P networks distribute infringing copies of motion pictures (and works in other forms such as music, games and books) with file sharing software such as BitTorrent as follows: The process begins with a person who decides that a particular work should be available for free to his/her fellow Internet users. After obtaining a digital file of the work or taking the work and making a digital file copy of it, that person uses a BitTorrent client to create what is called a "torrent file."  A torrent file is uniquely associated with the digital file of the work (sometimes referred to as the "content file").  That person, who I will refer to as "the initial seeder," then accesses the Internet through an Internet Service Provider ("ISP") and intentionally makes the content file of the work available on the Internet to the public from his/her computer.  That content file on the initial seeder's computer is often referred to as the first or initial "seed."

9.      As indicated above, there is a one-to-one relationship between the content file and the torrent file.  The torrent file, among other things, points to the content file.  While the content file is very large, the torrent file is very small.  The torrent file describes the content file that is being distributed, what pieces, often referred to as "blocks" or "chunks," into which the content file is divided, and other information needed for distribution of the content file.  Typically, the title of the torrent file would include the name of the work included in the content file.  The initial seeder would make his/her torrent file available on one or more websites.  Alternatively, instead of uploading the torrent file to one or more websites, an initial seeder could make a link, often referred to in the field as a "magnet link," available on one or more websites. The magnet link is a relatively new medium by which peers can access torrents.  Its popularity is due to its not requiring the hosting of any files on a continuously available website.  The magnet link is a uniform reference indicator ("URI") scheme similar to a uniform reference locator ("URL") that, when clicked, allows the aforementioned torrent file to be downloaded from other peers (at first the initial seeder) connected to the swarm as opposed to an individual web server.  In either event, for a piece (or block) of a content file to be copied by one peer from another member of the swarm that is acting as a seeder (e.g., because that other member has at least one block of the content file), both computers must have the same torrent file.  The torrent file includes other data such as the separate hashes for each of the pieces into which the content file is divided for BitTorrent P2P distribution.  (A "hash" is an alphanumeric string of characters mathematically

7

derived from the characteristics of a file.)  With the block-hash data, the computer doing the downloading, after it receives a block, does, through the BitTorrent client on its computer, a mathematical analysis of the downloaded block to confirm that that block has the hash that it should.   That guarantees that only correct pieces of the content file are copied from one computer to another.

10.     By way of a broad analogy, the "content file" would be similar to the 1,276 page unauthorized copy of the Torts Casebook made by the first student in the "old school example" given above.  The first student would be similar to the "initial seeder," the "blocks" into which the content file is divided for distribution would be similar to the sets of pages into which the 1,276 pages were divided, the "torrent file" would be similar to the notice posted by the first student, the BitTorrent P2P network "swarm" (i.e., all the computers that have joined the swarm) would be analogous to the room with the photocopy machines in it, and the subsequent students would be similar to "peers."

11.     With the title of the work being at least part of the torrent file's title, Internet users looking for a work will likely find the torrent file.  In fact, people looking to obtain a copy for free could actually search online for the title of the work plus the word "torrent."  Persons seeking to download such a work also access the Internet through an ISP (which may or may not be the same ISP as used by the initial seeder) and seek out the work on a P2P network.  When such a person finds it, he/she downloads the subject torrent file.  Then, opening that torrent file with his/her BitTorrent client, he/she can have his/her computer join the "swarm," that is, join the group of people exchanging the work among themselves. In turn, as each peer receives portions of the seed, most often that peer makes those portions available to other peers in the swarm. Therefore, each peer in the swarm is at least copying and is usually also distributing pieces of the work at the same time.

12.     Any BitTorrent client may be used to join a swarm.  As more peers join a swarm at any one instant, they obtain the content at even greater speeds because of the increasing number of peers simultaneously offering the content as seeders (or at least partial seeders) themselves for distribution of the work.  In this regard, a swarm that starts with an initial seed may at any later time have tens, hundreds, or thousands of partial and complete seeds.  Seeds and

8

peers may enter, leave and re-enter a swarm at any time.  As time goes on, the size of the swarm varies, yet it may endure for a long period, with some swarms enduring for 6 months to well over a year depending on the popularity of a particular work.  CEG is monitoring torrent swarms which remain active today even after the original upload of a torrent file in 2009.  As a result, the initial seed file becomes duplicated multiple times by multiple parties, with a potentially exponential increase in the number of copies of any work.  With respect to any particular swarm, the hash (an alphanumeric representation of a file) of a torrent file remains the same.

13.    The premise of BitTorrent sharing is well known, and is stated on the Bittorrent.com website, at least until recently here,

http://www.bittorrent.com/help/guides/beginners-guide (attached to this Declaration as **Exhibit 8**)

as follows:

"BitTorrent is a protocol (a set of rules and description of how to do things) allowing you to download files quickly by allowing people downloading the file to upload (distribute) parts of it at the same time. BitTorrent is often used for distribution of very large files, very popular files and files available for free, as it is a lot cheaper, faster and more efficient to distribute files using BitTorrent than a regular download."

14.    As can be seen here,

http://www.bittorrent.com/help/faq/concepts (attached to this Declaration as **Exhibit 9**)

my description given above is consistent with BitTorrent, Inc.'s own description.

15.    An explanation of the BitTorrent system and process can be found at a webpage found at:

http://bittorrent.org/introduction.html (attached to this Declaration as **Exhibit 10**)

That web page is linked to from BitTorrent, Inc.'s own website.  This is the explanation they provide:

"The key to scaleable and robust distribution is cooperation. With BitTorrent, those who get your file tap into their upload capacity to give the file to others at

9

the same time. Those that provide the most to others get the best treatment in return. ('Give and ye shall receive!')

"Cooperative distribution can grow almost without limit, because each new participant brings not only demand, but also supply. Instead of a vicious cycle, popularity creates a virtuous circle. And because each new participant brings new resources to the distribution, you get limitless scalability for a nearly fixed cost.

"BitTorrent is not just a concept, but has an easy-to-use implementation capable of swarming downloads across unreliable networks."

The web page also provides this diagram of the initial seeder and peers with accompanying wording:



**The BitTorrent Solution:**
**Users cooperate in the distribution**

Note that in P2P networks, the copying may continue even after the initial seeder has gone completely offline because of the replication perpetually occurring in the swarm.

16.     Each user of a computer that has a particular torrent file on his/her computer and has joined a swarm related to that torrent file, has voluntarily caused his/her computer to "shake hands" with other members of the swarm to either copy the content file associated with the torrent file or to enable another member of the swarm to copy a portion of the content file from

10

his/her computer, or both.  This is a deliberate act.  Unlike stumbling onto, for example, a youtube.com web page that automatically plays a video, with the Internet user merely watching the video on that web page, anyone who downloads a movie over a P2P network has taken several intentional steps while connected to the Internet to download (that is, make a copy of) the movie. These voluntary steps include: (i) making sure that the user's computer includes a BitTorrent client (an application as described above), (ii) finding a torrent file, or a magnet link to a torrent file, on the Internet associated with the desired content, (iii) actually downloading that torrent file on to the user's computer, by clicking on the torrent file link or on the magnet link to the torrent file, and (iv) starting the BitTorrent client, (v) using the BitTorrent, locating and opening the torrent file on the computer, and (vii) clicking on "OK" or a similar button in the BitTorrent client to start the downloading of the content file.  Sometimes, steps (iv) and (v) are reversed.  That is, the user finds the torrent file on his/her computer, clicks on it and his/her computer launches his/her BitTorrent client with the torrent file opened in it.  When a magnet link is used, steps (iii), (iv) and (v) appear to be combined into a single step.  That is, upon the user's clicking on a magnet link, the torrent file is downloaded to his/her computer and his/her BitTorrent client is launched with the torrent file opened in it.  In any event, the user still must, even after clicking on the magnet link, purposely click on the "OK" button in the BitTorrent client to begin downloading the content file.  At that point, the torrent file makes the computer a part of the swarm, with the computer copying from and often distributing the content file to others.  Continuing in this regard, even after the person has downloaded the desired movie, his/her computer will, unless set otherwise, continue allowing others to copy from it.

17.     When an unauthorized copy of a copyrighted work is the content file in question, each peer (i.e. member of a swarm) in a P2P network sharing that unauthorized copy has acted and acts in cooperation with the other peers by providing an infringing reproduction of at least a portion of a copyrighted work. This is done in anticipation of other peers doing likewise with respect to that work and/or other works.  The act of joining a P2P network is, as noted above, intentional, requiring the selection by a peer of URLs, links, and/or files, and then the clicking of an "OK" button to do so.

11

18.    Depending on the particular P2P network involved, at any one time any number of people, from one or two to tens of thousands, unlawfully use the P2P network to upload (i.e. distribute), or download (i.e. copy or replicate), copyrighted material.  To the extent that persons using a P2P network identify themselves, they use "user names" or "network names" which typically are nicknames that do not disclose the true identity of the user, and do not indicate the residence or business address of the user.  So, while, as I explain below, we can detect infringements, we can only identify the infringers by their Internet Protocol address ("IP address") and the time that the infringement is detected by us.  Note that while we detect an infringement at a particular instant, the infringer may have been infringing at other times as well.

19.    The use of P2P networks, such as those accessed with BitTorrent software, to make unauthorized copies of motion pictures has become such common knowledge that it is casually mentioned in newspaper articles.  For example, in the article titled "The Glut of Shows Unwatched" published on the New York Times website, and which at least until recently could be seen at this web page:

> http://www.nytimes.com/2010/09/06/business/media/06carr.html (attached to this
>
> Declaration as **Exhibit 11**),

there is this statement by the article's author who was describing his efforts to find a television show he had missed:

> "Starting to feel desperate, I thought for a moment about hopping on the laptop
> and searching BitTorrent for an illegal copy, but given that I make a living
> creating original content for a large media company, stealing from another one
> did not seem like a good idea."

20.    Plaintiff and other similarly situated companies contract with CEG to have CEG determine whether or not copies of their works are being distributed on the Internet without their permission, and to identify infringers.  Plaintiff does not authorize distribution of its motion pictures on P2P networks.  Further in this regard, CEG is in no way involved in creating the torrent file used in any swarm, nor in making any content file available for downloading by members of a swarm except to the extent that CEG has obtained any blocks of a content file from other peers or seeds during a monitoring session.

12

21.     CEG utilizes a system of software components ("the System") conceptualized, developed, and maintained by me in order to collect data about unauthorized distribution of copies of copyrighted works on P2P networks.

22.     The System was designed for certain functions including, but not limited to: downloading substantial portions of content files from seeds and peers in a swarm, verifying data accuracy and accountability processes, confirming infringements, logging evidence, and the absolute prevention of false-positives.  In fact, the System has multiple levels of error detection, and its architecture is conducive to preventing false-positives.  Every unique suspect content file is visually verified by two people upon its inaugural acquisition.

23.     The process as it relates to monitoring copyrighted works of CEG's clients begins as follows.  When a copyrighted work is requested to be monitored, we use a web-based search to find torrent files on the Internet that have the same title as the copyrighted work.  As indicated above, a torrent file is a small file.  Its file extension is ".torrent."  A BitTorrent P2P network infringer will at some point have both the torrent file and at least a portion of the illegal copy file of the work (sometimes referred to herein as the "accused file") on the infringer's computer.  In every case that a CEG client's motion picture is available on a P2P network, it is an unauthorized distribution of the motion picture.

24.     Like any other person who wants to be a peer, we locate a torrent file relevant to a particular motion picture of one of our clients, download that torrent file to the System, and join the swarm associated with that torrent file on the Internet.

25.     When a digital copy file with the same name as CEG's client's motion picture is found on a P2P network, CEG downloads a full copy of the suspect content file.  The file is then forwarded to a two stage verification process.  First, one person plays the downloaded file to visually confirm that the downloaded file is at least a portion of the client's motion picture.  If that confirmation is made, then a second person independently plays the downloaded file for the same purpose.  If both people confirm that a substantial portion of the motion picture in the suspect file is substantially the same as a corresponding portion of CEG's client's motion picture, then particular unique data (in particular, a "hash") relating to the torrent file associated with the suspect content file (now referred to in this Declaration as the "accused file") is noted by the

13

System, and the System searches for additional computers on the P2P network that have, and are actively distributing, the accused file through that torrent file (hereinafter the "infringement enabling torrent file").  Note that any particular work may be the subject of copying by two or more different initial seeders.  In such a case, the two torrent files would have different hashes from each other, and each would be the basis for a separate swarm.  CEG tracks the swarms separately, and all Doe Defendants listed in any one case were members of the same, single swarm.

26.     Users subscribe to the services of an ISP to gain access to the Internet.  Each time a subscriber accesses the Internet, the ISP automatically allocates a unique IP address to the subscriber.  An ISP generally records the times and dates that it assigns each IP address to a subscriber and maintains for a period of time a record of such an assignment to a subscriber in logs maintained by the ISP.  In addition, the ISP maintains records which typically include the name, one or more address, one or more telephone numbers, and one or more email addresses of the subscriber.  P2P technology relies on the ability to identify the computers to and from which users can share files.  The technology identifies those computers by the IP address from which the computer connects to the Internet.  Taking advantage of this technology and the unique data associated with the torrent file having a one-to-one relationship with the file containing the unlawful copy of CEG's client's motion picture, CEG's System inspects file-sharing networks for computers that are distributing at least a substantial portion of a copy of a copyrighted work owned by Plaintiff.  That is, CEG searches for computers that are active members of the swarm, uploading and downloading the accused file through use of the infringement enabling torrent file.  When CEG finds such a computer, CEG downloads a portion of the copy of the accused file from the located computer using the infringement enabling torrent file.  CEG's System also logs the following publicly accessible information relating to each computer from which CEG has downloaded a portion of the copy of the accused file:

> (a)     the time and date that CEG's System observed the infringer connected to
> the P2P network with respect to the infringer's computer's downloading
> and/or uploading the accused file to the Internet (hereinafter referred to as
> "Timestamp"),

14

(b)  the IP address from which the infringer's computer was connected to the Internet at that time and date,

(c)  the BitTorrent client used by the infringer and the port number used by the infringer's BitTorrent client,

(d)  the size of the accused file on the observed infringer's computer,

(e)  the percent of the accused file downloaded by CEG from the infringer's computer,

(f)  the hash of the torrent file that is associated with the accused file, and

(g)  any relevant transfer errors.

To the extent that any relevant transfer errors do exist, the particular instance is removed from the System.  To ensure the accuracy of the Timestamp, each of CEG's tracking servers has a Network Time Protocol daemon (i.e., program running in the background) deployed.  This program maintains the System time in synchronization with time servers on the Internet.  CEG has used this software since the inception of the System.

27.    In addition, CEG uses available databases to record the name of the ISP having control of the IP address and available geolocation databases to record the United States state (and often the city) associated with that IP address.  However, because of the partially anonymous nature of the P2P distribution system used by Defendants, the true names, street addresses, telephone numbers, and email addresses of Defendants are unknown to Plaintiff at this time.

28.    As an additional check, CEG rejoins the swarm associated with the suspect torrent file and again downloads the entire unauthorized copy of the motion picture.  This new download is viewed by a person to confirm that it is a copy of at least a substantial portion of the Plaintiff's motion picture.  Thus, CEG has confirmed that each of the files downloaded by it from the Doe Defendants listed in **Exhibit A** attached to the Complaint filed in this case is a copy of at least a substantial portion of the copyrighted work listed in **Exhibit A**.  All of this information is stored in database files on CEG's computers.

29.    As indicated above, an Internet Protocol address (IP address) identifies the internet connection through which a computer accessed the Internet to commit the copyright

15

infringement. The IP address utilized by P2P networks, and collected by CEG, is the public address, which is a globally unique address.  If one knows a computer's public IP address, one can, using publicly available reverse-lookup databases on the Internet, identify the ISP used by that computer as well as the United States city and state in which the computer was located. Based on the information from such a database, CEG believes that computers associated with all the Doe Defendants listed in **Exhibit A** were used in infringements of Plaintiff's Work in the state in which the court listed in the caption above is located.   However, the actual name and address of the person subscribing to the ISP's service is neither publicly available, nor available to CEG.

30.     With the Internet Protocol address and the date and time that the infringer's computer was accessing the Internet through the ISP, the ISP (be it AT&T, Verizon, Qwest, Comcast or any other ISP) can review its own subscriber logs to identify either (i) the names and addresses of the subscriber, or (ii) the intermediary ISP through which the person is ultimately subscribed to the main ISP.  In turn, if the intermediary ISP is provided with the Internet Protocol address and the date and time that the infringer's computer was accessing the Internet through the ISP, then the intermediary ISP can review its own subscriber logs to identify the name, addresses, telephone numbers and email addresses of the subscriber.

31.     With respect to accused files, CEG sends notices, sometimes referred to as "Digital Millennium Copyright Act notices" or "DMCA notices," to ISPs.  Each notice includes the identity of an accused file and the Internet Protocol address of the computer having that file available for download, along with the Timestamp associated with it.  In the notice, CEG requests that the ISP forward the notice to the ISP's subscriber associated with the Internet Protocol address.  Each notice includes, among other information, an address for the accused infringer to contact CEG to arrange for settlement.  In the above-captioned case, the Internet Protocol addresses identified in **Exhibit A** of the above-mentioned Plaintiff's Complaint are those of subscribers who had not settled with CEG.  **Exhibit A** lists on a Defendant-by-Defendant basis (one Defendant per row) the IP address associated with each Defendant, the identity of the ISP associated with the IP address, the Timestamp that the infringement by that Defendant was observed by CEG, and the software protocol used by the Defendant in infringing

16

the Plaintiff's Work.  The title of the Work, along with its copyright registration number, is set forth on the first page of **Exhibit A**.  Note that CEG's System does not monitor all infringers all the time.  While the Timestamp indicates the observation of an infringing copy at a computer communicating with the Internet through a particular IP address, it is likely such a computer had an infringing copy of the Work on it at times before and after CEG's System observed the infringement.

      32.    With respect to Plaintiff's copyrighted motion picture named in the Complaint, CEG performed the steps described in paragraphs 21-31 above.  In summary, at least one computer at each of the respective IP addresses listed in **Exhibit A** of the Patrick Collins, Inc. Complaint was used to make an unauthorized digital file copy of at least a substantial portion of Plaintiff's Work and had such at least substantial portion of Plaintiff's Work on it, and, without authorization, was used to make such file available for download by others on a P2P network. As indicated above, all of the infringers identified as "Doe" defendants in the Patrick Collins, Inc. Complaint used BitTorrent software.  Further, the hashes associated with the torrent files on the computers having the IP addresses and Timestamps listed in **Exhibit A** are all identical to each other, that is, they all have the same alphanumerical hash.  This demonstrates that all the Doe defendants listed in **Exhibit A** joined the same swarm.

      33.    CEG sent DMCA notices as described above to the ISPs with respect to all the Doe Defendants in the case.  None of the ISPs provided the names and addresses of the Doe Defendants to CEG.  However, as indicated above, we could determine, from publicly available databases relating to geographic locations of IP addresses, that the Doe Defendants in this case are likely within the state in which this Court is located.  (Because of intermediary ISPs and the location of the ISPs technical facilities, these locations cannot be exactly pinpointed from publicly available information.) Without information held by the ISPs, we cannot obtain further information needed to identify the Defendants, including their names, actual addresses, telephone numbers and email addresses.

      34.    In summary, the Defendants in this case all copied at least a substantial portion of the exact same accused file using the exact same torrent file.  Furthermore, because of the nature of BitTorrent software, each Defendant permitted other users to download the accused file from

17

that Defendant's computer.  Thus, the Defendants were simultaneously trading (downloading and/or uploading) the exact same file.  While Defendants engaged in this downloading and/or uploading of the file, they exposed their globally unique public IP address.  With BitTorrent software, one can see the IP address of the various computers that one is connected to, and which are sharing files in cooperation with one's own computer.

35.     Continuing the summary, because the Defendants' alleged conduct occurred behind the mask of their respective anonymous IP addresses, neither CEG nor Plaintiff knows the identity of the Doe Defendants, namely the "seeds" and "peers" who utilized BitTorrent to copy, and to allow others to copy, Plaintiff's motion picture.  Accordingly, CEG utilized its proprietary file-sharing forensic software to obtain the unique IP addresses that were used by the respective swarm members to distribute Plaintiff's copyrighted work. The software allowed CEG to identify the ISP and unique IP address for each subscriber on the date and at the time of the allegedly infringing activity was observed. Plaintiff therefore identified each Doe Defendant in **Exhibit A** of the Patrick Collins, Inc. Complaint by the unique IP address assigned to the Internet subscriber by the subscriber's ISP at the date and time of the observation.

36.     I am informed that before any discovery can be made in civil litigation, a meeting of the parties or the parties' counsel must be held.  However, the actual identities of the Doe Defendants are unknown to Plaintiff, and therefore the Patrick Collins, Inc. Complaint cannot be served on any defendant.  Without serving the Patrick Collins, Inc. Complaint on any defendant, the pre-discovery meeting cannot be held.  Therefore, Plaintiff needs early discovery from the ISPs, and any intermediary ISPs that may be involved, so that the names and addresses of the accused infringers can be obtained by Plaintiff to enable it to enforce its rights in its copyright and prevent continued infringement.

37.     ISPs retain their logs for only a limited time.  Based on my hands-on experience in working with ISPs, such information is retained for only six months or less on average.  Thus, such information must be requested expeditiously and the ISPs must be instructed to retain such information for this litigation.

18

38.    I declare under penalty of perjury that the foregoing is true and correct of my own personal knowledge, except for those matters stated as information and belief, and those matters I believe to be true, and if called upon to testify I can competently do so as set forth above.

Executed this __27th__ day of __March___, 2012 in Los Angeles, California.

Jon Nicolini

EXHIBIT 1
to **DECLARATION OF JON NICOLINI**



19,313,229 articles and books





- **Periodicals** - Literature

[                    ]  [ Search ]

- **Keyword** - Title - Author - Topic

**Member login**

User name [          ]
Password [          ]
[ Login ]  □ Remember me

Join us  Forgot password?

The Free Library > Business and Industry > Business > Video Age International > March 1, 2003
The Free Library > Communications > Telecommunications industry > Video Age International > March 1, 2003
The Free Library > Date > 2003 > March > 1 > Video Age International

## DVD piracy in the U.S. becomes an industry.

**Article Details**

Printer friendly  Cite/link  Email  Feedback

| | |
|---|---|
| Author: | Serafini, Dom |
| Publication: | Video Age International |
| Geographic Code: | 1USA |
| Date: | Mar 1, 2003 |
| Words: | 1272 |
| Previous Article: | Calendar of events. |
| Next Article: | Sumner's clever U.K. adventure. |
| Topics: | Motion picture industry |
| | Crimes against |
| | Movie industry |
| | Crimes against |
| | Music industry |
| | Crimes against |
| | Statistics |
| | Piracy (Copyright) |
| | Statistics |

**Symantec® Security**                                    Ads by Google
Most Effective Security Software for Small Businesses. Buy Online!
www.Symantec.com/Security

**Online Finance Videos**
Latest News in Personal & Business Finance. Watch Here for Free!
www.mevio.com/finance

**Discover Google+**
Hanging out with Your Friends has Never been so Easy. Join Google+!
google.com/+

f Like    g+1  0

Link to this page

Audiovisual piracy is a rich but dangerous business in the U.S. Last November, two armed would-be robbers broke into a small illegal CD and DVD manufacturer in Manhattan and one of them was killed. Similarly, a few months earlier, in July, also in New York, two men were wounded at the facility of a small illegal home video duplicator located near the Empire State Building.

According to the MPAA, the U.S. studios' association, over 400 labs for illegal duplication and replication of audiovisual content are discovered every year in the U.S., most of them in New York metropolitan area. Miami, Florida, serves as the center of audiovisual piracy for Latin America.

**Video Production Phoenix**                              Ads by Google
HD video, shooting, editing, Corporate, Web, Training, Demo
www.ProOneMedia.com

**Music industry**
Not sure which music job is for you? Learn about each one here!
GetInMedia.com/MusicBusiness

In 2001, the legit U.S. music market was valued at $13.7 billion with the piracy market estimated at $4.5 billion. In the same year, the theatrical market was valued at $68.2 billion. But piracy caused losses of $3 billion (excluding Internet piracy, which is not quantifiable). It is estimated that last year, DVD sales and rentals reached $10.6 billion in the U.S.

The number of illegal CDs in circulation worldwide in 2001 was estimated at 950 million, but only 20 million of these were confiscated. It is also estimated that 130 million blank DVDRs were sold worldwide in 2002.

According to the RIAA, the recording industry association, illegal sellers of CDs can deprive U.S. stores of 3540 percent of their business, in addition to diminished revenues for artists, technicians and the state, in the form of uncollected taxes. In California alone some 18,000 jobs were lost because of audiovisual piracy. Retailers in America don't seem to care for parallel imports, which mostly hurt the owners of audiovisual rights. Often DVDs and CDs cost less in the U.S. than in Europe, but the EC is not in favor of technologies that may hinder free use. Therefore, parallel imports from countries where DVDs are less expensive or face fewer restrictions could be more a matter of illegal imports than of piracy.

**Related Articles**

Finding the source of DVD piracy is elusive.

IT'S EVEN BIGGER THAN DRUGS CD, DVD PIRACY MAKES BILLIONS IN CHINA.

The good, the bad and the ugly of TV piracy.

PIRACY GETS TOP BILLING ON VISIT MAYOR TO PRESS FAKE-DVD ISSUE.

HOLIDAY BLITZ TAKES AIM AT DVD PIRATES SHOPPERS RECEIVE WARNING.

Thanks to recent technological advances, audiovisual piracy is moving from pressed (replicated) CDs and DVDs to illegal DVD-Rs and CD-Rs via duplication (burning or recordable). Nowadays one can legally buy blank CD-Rs at 30 cents each, even in small quantities. Therefore, to distinguish their product, big recording labels don't use CD-Rs (recognizable by the bluish hue on one side), and employ expensive replication equipment.

To compensate for the losses due to piracy, U.S. recording companies recently decided to increase the average retail cost of CDs from $15 to $17 each, well aware that this could cause a surge in illegal sales (where costs amount to about $5 per disc). The retail cost of legal CDs includes the "royalty" fee. The Philips CD license agreement lowered the fee from $0.03 to $0.0 175 on each recorded CD made since July 2002, whereas the cost of polycarbonate resins increased to $3 per pound, representing 40 percent of the production cost of a blank CD-R.



To reduce piracy, some companies also produce their CDs in such a way that they cannot be used in computers or transferred onto MP3 players, and they insert a CSS encoding program in DVDs. These systems may discourage consumers, but they seldom work with professional pirates.



CD / DVD Burning

The least expensive way to produce illegal CDs and DVDs is through duplication with a burner worth about $9,000, but this can only be used for limited quantities. Recently, though, Marcan has introduced a new duplication system able to copy 100

CD-Ps at a time. Replicating large quantities of discs from a master is much more expensive. Such equipment can cost up to $500,000.

A way to control piracy consists in monitoring the manufacturers of duplication equipment (about 40 in the U.S.), as well as replicators of CDs and DVDs (about 50). However, used equipment is not as easy to trace, except by way of repair parts and maintenance.

Since most recordable drivers are produced by Pioneer, it's also possible to monitor piracy at the source, controlling the distribution of small equipment. In fact, there are only nine basic producers of drivers in the world, including Philips, Sony and Ricoh. Drivers labeled with other brand names such as Dell and Apple are always repackaged versions of the original brands.

Furthermore, since the number of polycarbonate producers is also small (Dow Plastic, Bayer Polyolefins, GE Plastics, among others), the production of blank CDs and DVDs could also be monitored. Optical grade polycarbonate is not that common, and replication uses a lot of it.

An element that would elude authorities' control is the packaging industry; CD and DVD cases can be purchased for as low as $0.49 each. But only large groups such as Sony and Du Pont produce the plastic material used to make those cases.

According to Barry Rosenstock, president of Anchor Digital, a DVD production company, the New York market is flooded by replicated lowend pirated DVDs from Taiwan, mainly produced by Ritek, Primedisc and Optodisc, costing one-fourth of what other illegal DVDs may cost. Conversely, much of the piracy done in the U.S. is on CD-R and DVD-R, the recordable formats. Most DVD duplicators are made by Bravo, but there are also machines which are made by various companies. However, these almost always use Pioneer drivers to do the burning.

Katherine Cochrane, president of CD-Info, said that most made-in-the U.S. piracy concerns CD-RIDVD-R, while pressed discs are imported, since it's very difficult to hide replicating equipment.

According to Tony Perez, director of the anti-piracy division of International Recording Media Association (IRMA), "Pirates seeking high volume production will not invest in expensive injection moulding equipment, but rather misrepresent themselves to legitimate replicators and get them to manufacture product." The duplication cost of a DVD is $0.95 (for 5,000 items without cases) versus $2.50 for a VHS tape.

Nine organizations fight piracy in the U.S., including the MPAA (video), RTAA (music), IRMA (duplication and recording), BSA (software), VSDA (video and CD retailers), IDSA (Internet), in addition to the FBI and local police.

U.S. associations against audiovisual piracy:

* www.mpaa.org/anti-piracy

* www.siia.net/piracy/

* www.bsa.org/usa/antipiracy/

* www.riia.org/protect-campaign-1.cfm

* www.ifpi.org

* www.recordingmedia.org (Irma)

* www.idsa.com

* www.vsda.org

* www.sdmi.org

RELATED ARTICLE: 2002 Statistics (source: IRMA)

Replication in the world:

* CD-Audio: 4.35 billion units

* DVD-Video: 1.32 billion units

Replication in North America:

* CD-Audio: 1.63 billion units

* DVD-Video: 630 million units

CD-R demand:

* 4.225 million worldwide

* 1.3 billion in North America

Home Video

* Rental: 103 million worldwide, 70 million in North America

* Sales: 1.183 billion worldwide, 650 million in North America

# EXHIBIT 2
## to **DECLARATION OF JON NICOLINI**


BROUGHT TO YOU BY HP
HP OFFICEJET PRO



E-Gang '09

# The Year's Most Pirated Videos

Andy Greenberg, 08.05.09, 6:00 PM ET

A word of advice to film and television execs frustrated by online video piracy: Stay away from superheroes.

Over the last six months, the hit graphic novel adaptation *Watchmen* and the popular NBC series *Heroes* ranked as the most often illegally downloaded movie and TV show, according to data tracked by peer-to-peer piracy research firm Big Champagne.

The simple lesson? Geeky young males--like many less piracy-capable viewers--don't necessarily like to pay for their entertainment. "I don't want to engage in too much stereotyping, but who are the people most actively helping themselves arm over arm to all this free video content?" asks Big Champagne Chief Executive Eric Garland. "They're going to be geek-leaning. Just think about how many Comic Con visitors are also heavy Bittorrent users."

**In Pictures: The Year's Most Pirated Movies**

**In Pictures: The Year's Most Pirated TV Shows**

*Watchmen* was downloaded nearly 17 million times from bittorrent trackers like the Pirate Bay and Mininova, according to Big Champagne. The second most pirated film, *The Curious Case of Benjamin Button*, was downloaded 13 million times. *Heroes* episodes were downloaded a total of 54.5 million times, just ahead of the CBS show *Lost*, with 51 million downloads.

Pirates' preference for tights and capes is nothing new. Last year's top pirated film by a large margin was the Batman sequel *The Dark Knight*, which was downloaded well in excess of 7 million times, by Big Champagne's rough count.

More significant may be the enormous growth in peer-to-peer downloads. *The Dark Knight*'s 7 million downloads wouldn't even place the film in this year's top 10 pirated films. Even marginally successful films like *The Day the Earth Stood Still* and *Transporter 3* were pirated close to 8 million times so far this year.

That overall growth in piracy seems to show that users' gradual switch from peer-to-peer music downloads to legal streaming music sources may not extend to video piracy. In a widely read report published in July, analyst firm Music Ally reported that illegal music downloads in Britain had fallen by a quarter between December 2007 and January of this year as young users increasingly used ad-supported free streaming services like Spotify and Last.fm.

But those streaming models may not staunch the flow of pirated TV and video downloads, Big Champagne's numbers show. Every one of the 10 ten most pirated TV shows, in fact, can also be streamed for free on sites like Hulu.com, veoh.com, or major TV network Web sites.

Today's tech-savvy TV audience, says Big Champagne's Garland, simply won't wait even a few days for a live television show to appear on a streaming Web site. That unfortunate fact made 2008 a "breakout year for television piracy," according to Garland. "There's been an evolution of expectation," he says. "If you tell a kid he has to wait a few days to see a television show on Hulu.com, he'll give you a blank stare."

The growing flood of illegal peer-to-peer downloads has recently come under fire in a high-profile lawsuit against the Pirate Bay, the world's most popular aggregator and host of bittorrent tracking files. In April, the Swedish site lost a criminal case filed by a consortium of film, music and media companies; its administrators were sentenced to a year in prison and required to pay $3 million in fines. But even if the Pirate Bay shuts down or removes its infringing files, downloaders will simply move to a host of second-tier sites waiting to absorb the Pirate Bay's audience. (See "Why Google Is The New Pirate Bay.")

In Big Champagne's list of pirated movies, Garland was most surprised by what wasn't on the list: the most recent *Star Trek* film, which was downloaded only around 5 million times in the last six months. Despite that film's mass geek appeal, Garland chalks its low piracy numbers up to the fact that pirates are skipping the low-quality video versions made with camcorders in theaters, and waiting for a higher-fidelity file stripped from an as-yet-unreleased *Star Trek* DVD. "I think that really flies in the face of everything we've thought about pirates as undiscriminating viewers," Garland says. "Even pirates will wait for quality. That strikes me as a kind of maturity in the black market."

Regardless of why *Star Trek* hasn't seen widespread piracy this summer, its producers at Paramount Pictures aren't asking too many questions. Alfred Perry, the studio's vice president for legal affairs, wouldn't speculate as to why *Star Trek* had eluded pirates. "We can say," he added, "That this is one list we are happy not to be on."

**In Pictures: The Year's Most Pirated Movies**

# EXHIBIT 3
## to **DECLARATION OF JON NICOLINI**



## Technical Report:  An Estimate of Infringing Use of the Internet – Summary

Dr. David Price, Head of Piracy Intelligence for Envisional, has authored a study that comprehensively estimates the amount of Internet traffic that is infringing.  This summary outlines the main points arising from the report, the full version of which can be found at: http://documents.envisional.com/docs/Envisional-Internet_Usage-Jan2011.pdf [1]

The 56-page report, commissioned by NBCUniversal, is the first study to specifically estimate the amount of infringing traffic on the Internet.

**THE BOTTOM LINE:  Approximately 23.8% of global Internet traffic is infringing with bittorrent specifically accounting for almost half of that amount** (representing 11.4% of global Internet traffic).  Infringing cyberlocker traffic contributed 5.1% of infringing traffic and video streaming sites (such as MegaVideo and Novamov) contributed 1.4%.  Other peer-to-peer networks (e.g., eDonkey and Gnutella) and file sharing arenas such as Usenet were responsible for the rest of the infringing traffic.

**Traffic numbers for the US showed that over 17% of US Internet traffic is estimated to be infringing with bittorrent responsible for more than half of that amount** (and equaling 9% of all Internet traffic in the US).  Cyberlockers, other peer-to-peer networks and file sharing venues contributed the rest of infringing traffic.



Estimate of infringing use of global internet bandwidth

Non-infringing/pornography - 76.24%

Infringing Usenet - 0.86%
Infringing eDonkey - 1.82%
Infringing other P2P - 1.60%
Infringing gnutella - 1.56%
Infringing cyberlockers - 5.12%
Infringing bittorrent - 11.39%
Infringing video streaming - 1.42%

All non-pornography infringing traffic - 23.76%

## BITTORRENT

The report includes a detailed individual analysis of bittorrent traffic, the most popular file transfer system in use today.  **The analysis focused on PublicBT tracker – the largest and most popular bittorrent tracker worldwide** – which holds information on over 2.7m individual torrents.

An analysis of the top 10,000 swarms (as measured by number of active downloaders or 'leechers') found that pornography (35.8%), film (35.2%), and television (12.7%) were the most popular content types.  Excluding pornography, only one swarm in the top 10,000 offered

---

[1] This summary may be found at http://documents.envisional.com/docs/Envisional-Internet_Usage_Report-Summary.pdf.

legitimate content and 99.24% of all material in the top 10,000 swarms was copyrighted. Including pornography, **63.68% of all content was copyrighted**.[2]

Envisional identified the content of all but 48 of the top 10,000 swarms and found that 85.5% were video content of some kind while software was 4.2% and computer games 6.7%.

**Approximately 60% of all peers connected to the top 10,000 swarms were sharing copyrighted film content.** Peers across all video categories (films, television, anime, sports, and pornography) represented slightly more than 88% of all peers in the top 10,000 torrents.

Extending the results of the top 10,000 torrents to all content represented by PublicBT indicates that, on the day of analysis, 11.5m peers were seeding or downloading copyrighted film content, 2.4m peers seeding or downloading copyrighted television content, and 3.2m pornography.

**Excluding pornography, Envisional project that 99.24% of all material on bittorrent was copyright infringing.**[3]

## CYBERLOCKERS/FILEHOSTING SITES

Estimating the amount of copyright infringing content stored on cyberlockers is more difficult than with Bittorrent as such sites do not usually allow stored content to be searched. Instead, users must search via a third-party indexing site such as Filestube.com or a linking site such as Warez-BB.org.

To check the representative nature of content stored on cyberlockers, Envisional collected a random sample of 2,000 cyberlocker links and determined the type of content and whether it was copyrighted. As with bittorrent, **most of the analyzed content – over 90% – was copyrighted material.**

## VIDEO STREAMING

In the same way that cyberlocker content is indexed by other sites, third-party portals such as MovieWatch.in or Movie2k.to offer users multiple links to the latest film or television show. For example, MovieWatch currently offers more than fifty separate working links for some popular movies.

To estimate the percentage of streaming content that infringes copyright, Envisional compared visitors to third-party index sites to visitors to bittorrent portals and multiplied that by the file size appropriate to each to yield a ratio of streaming traffic to bittorrent traffic.

---

[2] A number of fake torrents were discarded and not counted in the analysis.
[3] To check its analysis, Envisional sampled five groups of 100 torrents each from various points along the long tail of PublicBT content. Excluding pornography, no non-copyrighted content was found though the amount of material that could not be identified increased slightly.

Envisional concluded that infringing traffic that comes from sites that link to pirated material is equivalent to 1.42% of all Internet traffic but noted that the figure should be taken as a "cautious estimate".

**METHODOLOGY**

Having determined what percentage of peer-to-peer, cyberlocker, and streaming traffic is infringing, Envisional calculated the percentage of Internet traffic generated by each using data from 2009 reports from Sandvine, Cisco, Arbor Networks, and ipoque.

For example, Sandvine estimated bittorrent is responsible for 17.9% of total Internet usage and Envisional, as previously mentioned, calculated that 63.68% of all content tracked by PublicBT was infringing.  Multiplying the two (17.9% x 63.68%) indicates that infringing use of bittorrent is responsible for 11.39% of the world's Internet traffic.

**THE NUMBERS**

| Components of Infringing Global Internet Traffic | |
|---|---|
| Infringing bittorrent | 11.39% |
| Infringing other P2P | 4.97% |
| Infringing cyberlockers | 5.12% |
| Infringing video streaming | 1.42% |
| Infringing usenet | 0.86% |
| **Total** | **23.76%** |

| Components of Infringing US Internet Traffic | |
|---|---|
| Infringing bittorrent | 9.11% |
| Infringing other P2P | 3.77% |
| Infringing cyberlockers | 2.19% |
| Infringing video streaming | 1.52% |
| Infringing usenet | 0.93% |
| **Total** | **17.53%** |

**Piracy Intelligence**

Envisional Ltd

January 2011



**Media inquiries:**

Julie Pease
GroupNBT
julie.pease@groupnbt.com
+44 (0)20 7015 9317

David Price
Envisional Ltd
david.price@envisional.com
+44 (0)1223 372400

3

# EXHIBIT 4
## to **DECLARATION OF JON NICOLINI**



Help | Login | Signup

Home Page for the World's Business Leaders          Free Trial Issue

Search          Stock Quote

U.S.   EUROPE   ASIA

Home | Business | Investing | Technology | Entrepreneurs | Op/Ed | Leadership | Lifestyle | Lists

Digital Media

## Spore's Piracy Problem

Andy Greenberg and Mary Jane Irwin, 09.12.08, 10:00 AM EDT

**In a backlash against DRM restrictions, illegal downloaders aim a "virtual punch in the face" at EA.**

How do you measure the failure of the copy protections that software companies place on their media products? In the case of **Electronic Arts**' highly-anticipated game "Spore," just count the pirates.

As of Thursday afternoon, "Spore" had been illegally downloaded on file-sharing networks using BitTorrent peer-to-peer transfer 171,402 times since Sept. 1, according to Big Champagne, a peer-to-peer research firm. That's hardly a record: a popular game often hits those kinds of six-figure piracy numbers, says Big Champagne Chief Executive Eric Garland.

But not usually so quickly. In just the 24-hour period between Wednesday and Thursday, illegal downloaders snagged more than 35,000 copies, and, as of Thursday evening, that rate of downloads was still accelerating. "The numbers are extraordinary," Garland says. "This is a very high level of torrent activity even for an immensely popular game title."

**Electronic Arts** (nasdaq: ERTS - news - people ) had hoped to limit users to installing the game only three times through its use of digital rights management software, or DRM. But not only have those constraints failed, says Garland, they may have inadvertently spurred the pirates on.

On several top file-sharing sites, "Spore"'s most downloaded BitTorrent "tracker"--a file that maps which users had the game available for downloading--also included step-by-step instructions for how to disassemble the copy protections, along with a set of numerical keys for breaking the software's encryption. For many users, that made the pirated version more appealing than the legitimate one.

"By downloading this torrent, you are doing the right thing," wrote one user going by the name of "deathkitten" on the popular file-sharing site The Pirate Bay. "You are letting [Electronic Arts] know that people won't stand for their ridiculously draconian 'DRM' viruses."

"You have the power to make this the most pirated game ever, to give corporate bastards a virtual punch in the face," deathkitten added in another comment.

Another user with the handle "dsmx" sounded more conflicted. "I feel bad about pirating this game I really wanted to buy it but EA put DRM on it and my policy is that any form of DRM means an instant no parting with money," he wrote. "When I pay for something I want to own it not rent it with EA deciding when I'm not allowed to play it anymore."

The copy protections on "Spore" were equally detested by a less piracy-prone crowd at Amazon.com. By Thursday evening, the game had received more than 2,100 reviews, nearly 2,000 of which had given it a rating of one star out of five. Most negative reviews--including messages titled "No way, no how, no DRM" and "DRM makes me a sad panda"--cited the game's restrictions as a sore spot.

Electronic Arts calls those criticisms unfair. "EA has not changed our basic DRM copy protection system," says corporate communications manager Mariam Sughayer. "We simply changed the copy protection method from using the



SOFTWARE FINDER

GO   Powered by: capterra

Content Management Software          Accounting Software
Email Marketing Software             eCommerce Software
Project Management Software          Help Desk Software

>> Browse All Directories

### Most Popular

1. Dear Fake Geek Girls: Please Go Away | blog
2. The Five Personalities of Innovators: Which One Are You? | blog
3. Warren Buffett's $50 Billion Decision | blogslide
4. 6 Reasons Why I Don't Invest In The U.S. Stock Market | blog
5. At Home With Elon Musk: The (Soon-to-Be) Bachelor Billionaire | blogslide
6. 'Pink Slime' Controversy Takes a Toll on Beef Producer | blog
7. Curing Type 2 Diabetes with Surgery: It Works -- Now Let's Figure Out Why | blog
8. The Happiest Jobs In America | blogslide
9. Why Top Talent Leaves: Top 10 Reasons Boiled Down to 1 | blog
10. Why Apple Will Hit $1,650 by the End of 2015 | blog

physical media, which requires authentication every time you play the game by requiring a disc in the drive, to one which uses a one-time online authentication."

Electronic Arts compares its DRM solution to systems in place on services like iTunes that similarly limits the number of computers that can play a particular song. Sughayer also points out that less than 25% of EA users attempt to install the company's games on more than one computer, and less than 1% attempt to install it on more than three.

Peer-to-peer file theft is a growing problem for game developers. According to Big Champagne, games, along with television shows, are the two fastest growing types of media trafficked on peer-to-peer networks, though music remains the most often stolen medium. See "In Pictures: Why Web Pirates Can't Be Touched."

"PC games are massively pirated because you can pirate them," says Brad Wardell, chief executive of Plymouth, Mich.-based gaming company Stardock. Wardell argues that the driver for piracy is user-friendliness--not price. Instead of digital locks, Stardock requires users to use unique serial numbers which it monitors, in conjunction with IP addresses.

"Our focus is on getting people who would buy our software to buy it," Wardell says, rather than trying to strong-arm people unlikely to pay for the products into become paying customers.

DRM only limits the ability of consumers who wouldn't typically pirate media to make copies or share it with friends and family, agrees Big Champagne's Garland. But because encryption is so easily broken by savvier--and more morally flexible--users, it does little to stop the flood of intellectual property pirated over the Internet, he contends.

"DRM can encourage the best customers to behave slightly better," he says. "It will never address the masses of non-customers downloading your product."

**Also See:**

**Ten Things You Should Know about 'Spore'**
**Video Piracy-Without the Piracy**
**Free? Steal it Anyway**

**Security for Amazon Cloud** cloud.alertlogic.com
IDS for EC2 - Intrusion Detection. 24/7 Monitoring.
PCI Compliance.

**Create Beautiful Memories** www.digitalexpressionsaz.com
Looking For a Unique Party Idea? Call Us For An Open
Air Photo Booth

**VA Home Loan for Veterans** www.VAMortgageCenter.com
Get a Quote in 2 Minutes! VA Loans now Up to
$729,000 with $0 Down.

**Intellectual Property** www.create.org
Fuels Global Growth and Innovation and Improves
Competitiveness

◀ ▶                                              AdChoices ▷

**Rate This Story**

Your Rating  ☆☆☆☆☆    Overall Rating  ☆☆☆☆☆

**Reader Comments**

As a long time PC gamer, i can say with absolute certainty that i will never buy DRM software. Ever. I reformat my PC ever few months to clean it of garbage from the net. I need to be able to reinst **[Read More]**
Tags: no DRM ever
Posted by Gamerguy | 12/31/09 02:43 PM EST   Report Abuse

The quote by Sughayer is a red herring and he knows it. The issue is that people upgrade computers every few years, and people's computers crash and lose data from time to time. Each of those is anot **[Read More]**
Tags: DRM, upgrades, spore, Sughayer
Posted by shambala | 09/15/08 11:59 AM EST   Report Abuse

As both a techie and an avid gamer, I am fully aware of how easy it is to obtain an illegal copy of software and games. A lot of people I know prefer to download an illegal game rather than even **[Read More]**
Posted by CaptainMoose | 09/15/08 07:15 AM EDT   Report Abuse

CEO Book Club
BOOK REVIEW
The Other India



BOOK REVIEW
Taylor Rules
David R. Henderson
In a new book, economist John Taylor
explains the cause of the crisis.

AdChoices ▷

# EXHIBIT 5
## to **DECLARATION OF JON NICOLINI**

CNET Reviews

# Kindle e-book piracy accelerates

## What's the dark side of the success of e-readers and e-books? In a word, piracy.

by **David Carnoy** | February 18, 2011 12:17 PM PST



The number of seeders and leechers for Kindle e-books continues to rise on The Pirate Bay.

(Credit: thescop.com (Jonathan Auxier))

Several months ago I set up a Google alert for my book, "Knife Music," to keep abreast of anything anybody was saying--good or bad--about the thing. Over the months I've received news of the occasional blog post and tweets, but more recently I popped open an alert to learn that my book was being pirated--both as a separate file and part of two larger Torrents called 2,500 Retail Quality Ebooks (iPod, **iPad [http://www.cnet.com/ipad-3/]**, Nook, Sony Reader) and 2,500 Retail Quality Ebooks for Kindle (MOBI).

I had the strange reaction of being both dismayed and weirdly honored that someone had selected my book to strip free of its copy-protection (DRM) and include as part of a collection of "quality" e-books, many of which were from very good authors.

OK, so the use of the term "quality" was a reference to the formatting of the e-books and not the quality of the actual work, but for a moment I wasn't too bothered. After all, if someone downloads 2500 books, what are the odds he or she is going to even bother looking at yours? I was probably only losing a few bucks, especially considering my e-book is currently priced at $3.99, which only leaves me with about 50 cents a book after the publisher, e-book seller, and agent, take their cuts. Even if I missed out on selling 200 e-books, that's a mere $100. No big deal, right?

Well, obviously, for big authors, this whole pirating thing presents a bigger problem--and a bigger loss. But that isn't what dismayed me so much (sorry, but when

you're a little guy, you don't care so much about how much the big guys are losing). Rather, what's shocking, and what the publishers should be most concerned about, is the fact that a library of 2,500 books can be downloaded in a matter of hours. E-books are small files and 2,500 of them can be packed into a single download (Torrent) that's only about 3.4GB. If you set the average price per book at a measly $2, the worth of said download would be $5,000. Bring it up to $4 a book and you're at $10,000. (In fact, publishers charges much more for some of these books).

By comparison, a single DVD movie is usually larger than that, as well as many retail PC games, which tend to run in the 4GB to 7.5GB range. A "major" PSP title is about 1GB, sometimes a bit larger (yes, the PSP has been severely impacted by piracy).

I probably don't need to point this out but I will. I have about 600 books in my paper book collection, which took me years to gather and prune during various moves. Digitally, that same collection could be downloaded in around 30 minutes and stored on a cheap 1GB thumb drive, which could then be copied in a matter of seconds and passed on to someone else.

A lot of people think moving away from paper is a good thing. Maybe it is. But what should also be alarming to publishers is that the number of people pirating books is growing along with the number of titles that are available for download. As I've written in the past, **the rise of the iPad [http://www.cnet.com /8301-18438_7-20005008-82.html]** has spurred some of the pirating, but now the huge success of the Kindle is also leading to increased pirating. Yes some companies, such as Attributor, have done **some studies about the issue [http://news.cnet.com/8301-17938_105-20018831-1.html]** , and seen increases. But for my evidence one only need glance at Pirate Bay and see what people are downloading and how many of them are doing it.

The most popular e-book download on Pirate Bay is the Kindle Books Collection, which has something like 650 e-books in it (it's just less than 1GB), and is ahead of a 224-page PDF e-book called "Advanced Sex: Explicit Positions for Explosive Lovemaking." At the time of this writing, 668 people were "seeding" the Kindle collection while 153 people were downloading it. A few month ago, the numbers of people downloading e-book collections like this at given moment were in the 50 to 60 range with fewer seeders.

Now some of you in the comments section are going to inevitably say, who needs 2,500 books? And most people don't read all that much anyway. But the point here is that there may very well be a dark side to the success of e-books, which some are speculating will make up **50 percent of the market [http://www.mediabistro.com/ebooknewser/gina-centrello-ebooks-will-be-50-of-book-sales-in-five-years_b1267]** in as little as 5 years.

You can argue whether it was Napster or the rise of the **iPod [http://www.cnet.com /ipod/]** --or most probably both--that led to the huge amount of music piracy, but the book business will also take its share of big losses as it moves further into the digital realm. True, it's much harder to get someone to invest the time to read a book than to listen to an album, watch a movie, or play a game, so chances are piracy won't hurt the book business as much as those industries. But on the flip side, as I said before, it's also much quicker to download a huge collection of books or a number of New York Times bestsellers with a single click of a button.

How much will price play into all this? Well, you already have plenty of folks out there

who think it's outrageous for publishers to price an e-book at $12.99 or $14.99 when the hardcover is first released. And some of those folks may feel justified in downloading pirated versions of books in protest--or just because they say they don't like getting ripped off. And while some pricing decisions by publishers are clearly bad, pricing may be a smaller part of the piracy equation than you might think. What a surprising number of people have told me is that they pirate stuff for the same reason that a lot of people like the Kindle: it's all about instant gratification.

As one friend put it, "You want something, you click a button, you get it." He has a Netflix account and knows he can get a particular movie within 36 hours delivered to his door, yet he he says sometimes uses Bit Torrent to get the movie so he can watch it faster.

This is something publishers will have to contend with going forward. They know it, and Scott Turow, the President of the Author's Guild and a practicing lawyer, is acutely aware of **how much of a problem it is [http://www.cnet.com /8301-18438_7-20005008-82.html]** and could become.

"It [piracy] has killed large parts of the music industry," he said in an interview. "Musicians make up for the copies of their songs that get pirated by performing live. I don't think there will be as many people showing up to hear me read as to hear Beyonce sing. We need to make sure piracy is dealt with effectively."

Alas, so far it hasn't been dealt with effectively and I doubt it ever will be. It won't cost me much now--and it may even help me find a few readers who might not have read my book--but in the long run, it could really hurt. And unlike the New York Time's David Pogue, I've got no live act. Perhaps I need to get one, though I think I'd have a hard time matching his rendition of "**Apps, I did it again [http://www.youtube.com/watch?v=BJX2eJ6qoa0&feature=related]** ."

Comments?

EXHIBIT 6
to **DECLARATION OF JON NICOLINI**



EXHIBIT 7
to **DECLARATION OF JON NICOLINI**



CUSTOM REPORTS
ABOUT OUR DATA

Google+

SIGN UP

PDF Reader
★★★★★

Download

## Report Drill-Downs

You may click any of the Browser results below to drill down to a more detailed report for that individual Browser.
You can also check "Explore" to view multiple Browsers at a time.

| EXPLORE | BROWSER | TOTAL AVG | SEP '11 | OCT '11 | NOV '11 | DEC '11 | JAN '12 | FEB '12 |
|---------|---------|-----------|---------|---------|---------|---------|---------|---------|
| ☐ | Internet Explorer | 51.78% | 53.79% | 52.59% | 51.17% | 51.42% | 51.81% | 0.00% |
| ☐ | Firefox | 19.83% | 20.18% | 20.08% | 20.15% | 19.73% | 18.98% | 0.00% |
| ☐ | Chrome | 16.08% | 13.79% | 15.02% | 16.13% | 16.78% | 16.77% | 0.00% |
| ☐ | Safari | 10.95% | 10.81% | 11.13% | 11.29% | 10.69% | 10.93% | 0.00% |
| --- | Other ❓ | 0.80% | 0.86% | 0.66% | 0.71% | 0.83% | 1.00% | 100.00% |
| ☐ | Opera | 0.38% | 0.37% | 0.36% | 0.38% | 0.39% | 0.36% | 0.00% |
| ☐ | Gecko | 0.16% | 0.21% | 0.17% | 0.16% | 0.16% | 0.15% | 0.00% |

# EXHIBIT 8
## to **DECLARATION OF JON NICOLINI**



# Beginner's Guide

Help   >   Videos & Guides   >   Beginner's Guide

## What is BitTorrent?

BitTorrent is the global standard for delivering high-quality files over the Internet. With an installed base of over 160 million clients worldwide, BitTorrent technology has turned conventional distribution economics on its head. The more popular a large video, audio or software file, the faster and cheaper it can be transferred with BitTorrent. The result is a better digital entertainment experience for everyone.

BitTorrent is a protocol (a set of rules and description of how to do things) allowing you to download files quickly by allowing people downloading the file to upload (distribute) parts of it at the same time. BitTorrent is often used for distribution of very large files, very popular files and files available for free, as it is a lot cheaper, faster and more efficient to distribute files using BitTorrent than a regular download.

BitTorrent Mainline is a client. A 'client' in this case is a computer program that follows the rules of a protocol. For example, HTTP (HyperText Transfer Protocol) is the protocol used to download web pages and other content - like this page - and your HTTP client (or browser) is the program you use to get those web pages. Some popular browsers include Microsoft Internet Explorer, Mozilla Firefox, Safari, and Opera. To an extent, they all work the same way because they follow the same set of rules. The BitTorrent Mainline client will give you access to the world of content on the protocol in a lightweight, fast and reliable package.

## How do I download files using BitTorrent?

Just like you need a URL like 'www.google.com' to go to a web site and download content, you need a 'torrent file', a small file that tells the BitTorrent client the necessary info to download the content you want. This is generally obtained from a torrent website. Many websites offer torrents as one method of downloading files. For example, OpenOffice.org, a free alternative to Microsoft Office, can be downloaded using BitTorrent. Other sites, like legaltorrents.com, offer torrents of all kinds of things - these sites are just repositories of torrents and usually don't actually create any of the content available. They're known as indexes or trackers - there is a subtle difference between the two. (The Wikipedia article on BitTorrent trackers explains the difference.)

Once you've obtained the torrent file from wherever, you simply need to import it into BitTorrent. There are several ways of doing this.

- Click **File** then **Add Torrent** in BitTorrent (or press CTRL+O) and locate the torrent file.
- Double-click the torrent file. *(Only works if you've associated .torrent files with BitTorrent - BitTorrent asks you if it should do this the first time you run it. If you clicked 'No', you can do this by going to* **Options***, then* **Preferences** *in BitTorrent, then clicking* **Associate with .torrent files** *under* **Windows Integration***.)*
- *(advanced)* Click **File** then **Add Torrent from URL** in BitTorrent (or press CTRL+U), and enter a URL from which the .torrent file can be obtained.

**But before you start downloading, make sure you've followed the BitTorrent Connection Guide.** It doesn't take long and will help ensure that your torrent experience is faster and more consistent.

## BitTorrent finished downloading, but now it says it's

### Right sidebar

FAQ

**Videos & Guides**

- **Beginner's Guide**
- Send Files
- BitTorrent Connection Guide
- BitTorrent WebUI
- Creating A Torrent
- How To Make The PC - TV Connection
- Using RSS Feeds

Forums

User Manual

## Seeding. What does that mean?

**Seeding** is where you leave your BitTorrent client open after you've finished your download to help distribute it (you distribute the file *while* downloading, but it's even more helpful if you continue to distribute the full file even after you have finished downloading). Chances are that most of the data you got was from seeds, so help give back to the community! It doesn't require much - BitTorrent will continue seeding until the torrent is removed (right click the torrent, then hit **Remove**). Proper practice is to seed until the ratio of upload:download is at least 1.00.

## Can I really download *anything*?

BitTorrent is purely a content distribution method, just like a web browser, and similarly, does not incorporate any technology to monitor or restrict your activity. There is also nothing in BitTorrent that prevents anyone from seeing your IP address. Take care to follow your country's laws concerning copyrighted content.

## How do I know that someone isn't sending out viruses on BitTorrent?

In short, you don't. You should treat something downloaded with BitTorrent just like any file downloaded from the internet - that is, if you don't trust the source of the file, then you should use caution when opening it. If the torrent site you obtained it from offers comments, be sure to read those first. But regardless of the comments, running a virus scan on the downloaded files is usually a good idea. BitTorrent guarantees that the content you download is not altered from when the torrent was originally created, but if the source files used to create the torrent were already infected, this will provide no protection!

## Where can I find out more?

This guide and the User Manual is a good place to start. There is also a lot of BitTorrent reference information available on the internet, and searching for "bittorrent" on Google is a good start. The following sites are particularly useful:

- Brian's BitTorrent FAQ and Guide - a great resource to all things BitTorrent, with far more info than this page, though some of it is a bit technical.

- BitTorrent FAQ - Provides a list of common questions and answers and solutions to a number of common problems.

- BitTorrent User Manual - The main documentation for BitTorrent. Explains everything related to the client. Press F1 while viewing the BitTorrent window, or go to Help -> BitTorrent Help.

- The BitTorrent specification - Technical information on the way BitTorrent works.

- BitTorrent.org - a forum for developers to exchange ideas about the direction of the BitTorrent protocol.

    72 people like this.



# EXHIBIT 9
## to **DECLARATION OF JON NICOLINI**



English ▾

Get Started    Features    Community    Help

Get BitTorrent

BitTorrent Plus    Safer, faster torrenting.    Buy Now!

# Frequently Asked Questions

Help  >  FAQs  >  Concepts

## Concepts

⊖ **What do all these different terms mean (seeder, tracker, peer, etc.)?**

**availability**
The number of existing full copies of the file available to the client  for downloading. The higher this number is, the potentially easier and quicker it can be to download the complete file (not accounting for other factors). If this number is less than one (for example, 0.65) then there is not a full copy of the file available to download.

**block**
A block is a piece of a file. When a file is distributed via BitTorrent, it is broken into smaller pieces, or blocks. Typically the block is 250kb in size, but it can vary with the size of the file being distributed. Breaking the file into pieces allows it to be distributed as efficiently as possible. Users get their files faster using less bandwidth.

**client**
the BitTorrent software used to download and upload files. The BitTorrent client can be downloaded here.

**leech or leecher**
usually refers to a peer that is downloading while uploading very little, or nothing at all. Sometimes this is unintentional and due to firewall issues. The term leech is also sometimes used to simply refer to a peer that is not seeding yet.

**peer**
one of a group of clients downloading the same file.

**re-seed**
Re-seeding is the act of putting up a new complete copy of a file after no more seeds are available to download from. This is done to allow clients with only partial downloads to complete the download process and increases availability.

**scrape**
This is when a client sends a request to the tracker for information about the statistics of the torrent, like who to share the file with and how well those other users are sharing.

**seed**
a complete copy of the file being made available for download.

**seeder/seeding**
a peer that is done downloading a file and is now just making it available to others.

**swarm**
a group of seeds and peers  sharing the same torrent.

**torrent**
generally, the instance of a file or group of files being distributed via BitTorrent.

**torrent file**
a file which describes what file or files are being distributed, where to find parts, and other info

## FAQs

**BitTorrent Concepts**

BitTorrent DNA

BitTorrent Software Client

## Videos & Guides

## Forums

## User Manual

needed for the distribution of the file.

**tracker**
a server that keeps track of the peers and seeds in a swarm. A tracker does not have a copy of the file itself, but it helps manage the file transfer process.

⊖ **When I finish downloading a file, BitTorrent appears to continue uploading. What is it uploading?**

When BitTorrent finishes downloading a file, the bar becomes solid green and the newly downloaded file becomes a new "seed"--a complete version of the file. In this example, the top file is complete and can now seed.

It will continue to seed the file to other interested users until you tell it not to by pausing it or removing the torrent from your queue. The more clients that seed the file, the easier it is for everyone to download it. So, if you can, please continue to seed the file for others by keeping it in your queue for a while at least.

⊖ **Where can I find stuff to download using the BitTorrent Client?**

You can always check out www.bittorrent.com for a wide variety of digital fun. Other search engines, communities, and sites posting torrent files exist as well. You can even search for torrents by putting in what you're looking for, then adding "torrent" in any Internet search engine.

⊖ **Is BitTorrent really free?**

Yes, the BitTorrent software client, as well as creating, downloading, and sharing torrents with peers are completely free. There's no subscription, memberships, fees--nothing like that.

If someone DID charge you a fee to get our software client or access our site, you have been scammed and should seek a refund. Our software and web site can be freely accessed at http://www.bittorrent.com/.

⊖ **What is BitTorrent?**

BitTorrent is a way to transfer files of just about any size quickly and efficiently. It works by breaking files up into small pieces. The file is downloaded piece by piece from one or many different sources. It's efficient because you get faster downloads using a lot less bandwidth. The name BitTorrent is also used to describe the official BitTorrent client.

When you use BitTorrent, you make, distribute and get files. To make and share a file or group of files through BitTorrent, you first make it into a "torrent"--a small file which contains information about the files and about the computer that coordinates the file distribution. Others (refered to as "peers") find and open your torrent and begin downloading the pieces. As the file downloads to peers' machines, those peers also share the pieces they get with even more people who are also trying to download the same file. This sharing makes the file easier to download as more parts become available from multiple sources. Since the file is broken up into small pieces, little bandwidth is used to do the overall transfer. Once the file is finished downloading, the client software continues to share the completed file (becoming a "seed") with others looking for it. This also means the file can still be downloaded long after the original poster has stopped seeding the file.

    Like  ⨍ 57 people like this.

**⏓ @BitTorrent**
µTorrent 3.0 Beta just released! Streaming, ratings and sending...Blog: http://bit.ly /eEiApm, **Download:** http://bit.ly/bPZECM
**View Tweet**

**⬭ BitTorrent Blog**
Dubstep Master and Rising Star Billy Van is Now Available on BitTorrent
**View Post**

**⬡ Community Forums**
uTorrent 3.1.3 Big problems
**View Post**


**Get BitTorrent**

**Get Started**
Find Torrents
Apps

**Company**
About BitTorrent
Jobs at BitTorrent

**Help**
FAQs
Videos & Guides

**Products**
Windows
Mac

# EXHIBIT 10
## to **DECLARATION OF JON NICOLINI**

# BitTorrent.org

- Home
- For Users
- For Developers
- Forums
- Donate!

## What is BitTorrent?



**The Problem with Publishing:**
**More customers require more bandwidth**

BitTorrent is a free speech tool.

BitTorrent gives you the same freedom to publish previously enjoyed by only a select few with special equipment and lots of money. ("Freedom of the press is limited to those who own one" — journalist A.J. Liebling.)

You have something terrific to publish -- a large music or video file, software, a game or anything else that many people would like to have. But the more popular your file becomes, the more you are punished by soaring bandwidth costs. If your file becomes phenomenally successful and a flash crowd of hundreds or thousands try to get it at once, your server simply crashes and no one gets it.

There is a solution to this vicious cycle. BitTorrent, the result of over five years of intensive development, is a simple and free software product that addresses all of these problems.



**The BitTorrent Solution:**
**Users cooperate in the distribution**

The key to scaleable and robust distribution is cooperation. With BitTorrent, those who get your file tap into their upload capacity to give the file to others at the same time. Those that provide the most to others get the best treatment in return. ("Give and ye shall receive!")

Cooperative distribution can grow almost without limit, because each new participant brings not only demand, but also supply. Instead of a vicious cycle, popularity creates a virtuous circle. And because each new participant brings new resources to the distribution, you get limitless scalability for a nearly fixed cost.

BitTorrent is not just a concept, but has an easy-to-use implementation capable of swarming downloads across unreliable networks. BitTorrent has been embraced by numerous publishers to distribute to millions of users.

With BitTorrent free speech no longer has a high price.

Copyright © 2008 BitTorrent.org

EXHIBIT 11
to **DECLARATION OF JON NICOLINI**

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



September 5, 2010

# The Glut of Shows Unwatched

By **DAVID CARR**

The great thing about modern technology is that you never have to miss anything on television. That's also the terrible thing about it.

Last Sunday, I was traveling and did not see "Mad Men." As someone who cares about being in the know, when I got back on Monday, I wanted to catch up on the episode. Because I spend time on Twitter, I already knew that the episode included a creative session conducted in the nude, so I wanted to see it for myself before I came across other spoilers.

Having set my DVR — I subscribe to the FiOS television service from Verizon — for just such a circumstance, my wife and I plopped down on Monday night for a little time with Don and Peggy. I hit play, and then the screen went blank. After several more attempts, I called in the household's chief technology officer.

"You recorded the high-def channel," said my 13-year-old daughter Maddie, adding that seeing as I own a cheap set from Costco, it wasn't going to play.

Check, but not checkmate. Verizon has an on-demand service, but as it turns out "Mad Men" doesn't show up for a few days. Starting to feel desperate, I thought for a moment about hopping on the laptop and searching BitTorrent for an illegal copy, but given that I make a living creating original content for a large media company, stealing from another one did not seem like a good idea.

Then I remembered iTunes. Right there for $2.99, Season 4, Episode 6, "Waldorf Stories." As I took the iPad downstairs to put it closer to the wireless signal, I told my wife it was going to take about 30 minutes to download. When I got back upstairs, she was already asleep and I shrugged and settled in for a little me time with the Mad Men. I woke up in the middle of the night with the iPad perilously balanced on my less-than-flat midsection, wondering what I had missed.

That was Monday. By Wednesday, Steve Jobs, the sensei of all consumer desires, had announced the resurrection of Apple TV. For $99, I could buy a new geegaw from Apple that would allow me to rent, not buy, television shows for 99 cents that would

play on devices that won't fit on my stomach, like big flat-screen televisions. (Then again, for the time being only Fox and ABC are doing television business with Apple, so it would not have ended my search for "Mad Men.")

Apple is hardly alone. Amazon, Netflix and Google are getting in the television game. And all of them want to make sure that I have the means to dial up the programming I want at a time of my choosing on a device of my selection. Everyone wants to make sure that I never miss a thing.

But maybe I should. Television, which was once the brain-dead part of the day, had become one more thing that required time, attention and taste. I have fond memories of the days when there were only three networks and I could let my mind go slack as I half-watched Diane and Sam circle each other on "Cheers," because that was pretty much the only thing on.

Did watching those shows raise my cultural I.Q. or put me in the thick of social media discussions over whether Snooki was actually the author of her own place in the cultural narrative? Um, no. But neither did it turn me into a cool hunter, worried about missing something, or a technologist, juggling devices and platforms the minute I got home.

In the dawning era of an always-on database of television, even shows I missed on purpose now find me. It was always a source of iconoclastic pride that I never saw a single episode of "Seinfeld" or "Friends" back when they were in their prime, but in the era of multiplying channels and ubiquitous choices, those shows have now hunted me down.

The media world today is less the paradox of choice than the inundation by options. Right now, waiting patiently next to my television, I have "The Girl With the Dragon Tattoo," "Sin Nombre" and "Sunshine Cleaning." The latter two movies have been sitting there for months, and I can't remember the last time I used the DVD player for something not related to work.

My DVR is groaning at 79 percent of capacity, including that episode of "Deadliest Catch" from two months ago in which the captain dies. I ordered up episodes of "The Good Wife" for my iPad after hearing about it from friends and seeing that it got lots of Emmy nominations, but when I settled in on a long airplane ride to catch up, some guilty time with "Hot Tub Time Machine" got in the way.

That both recent and ancient television is, or will soon be, a few clicks away just adds to a buffet of media of all types I can't possibly finish. My iTunes library would not fit on my new iPad because I have about 75 gigabytes of music, 20,000 songs or so, many of which I have yet to hear.

Our ability to produce media has outstripped our ability to consume it. The average photograph now gets looked at less than once simply because there is almost zero cost and effort to producing one.

And gone now is the guilty pleasure of simply staring at something mildly entertaining. We don't watch TV anymore as much as it seems to watch us, recommending, recording and dishing up all manner of worthy product. Yes, it's the New Golden Age of Television, but I miss the old idiot box. It made me feel less stupid.

*E-mail: carr@nytimes.com;*
*twitter.com/carr2n*

Exhibit C – Copyright registration record of the Motion Picture at issue



## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Builder = (PA0001740861)[in Reg Nmbr/Doc Nmbr (K017)]
Search Results: Displaying 1 of 1 entries

### *REAL FEMALE ORGASMS 13.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | *PA0001740861* / 2011-04-06 |
| **Application Title:** | REAL FEMALE ORGASMS 13. |
| **Title:** | REAL FEMALE ORGASMS 13. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | PATRICK COLLINS, INC. Address: 8015 DEERING AVE., CANOGA PARK, CA, 91304, United States. |
| **Date of Creation:** | 2010 |
| **Date of Publication:** | 2010-12-06 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | PATRICK COLLINS, INC., employer for hire; Domicile: United States; Citizenship: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | Preexisting Footage. |
| **Basis of Claim:** | Compilation of preexisting footage. |
| **Names:** | PATRICK COLLINS, INC. |



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format | Full Record | Format for Print/Save |
| Enter your email address: | | Email |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright
Copyright Office Home Page  |  Library of Congress Home Page

Exhibit D – Believed State of Residence for each John Doe

Exhibit D.
Listing of the Believed State of Residence for Each John Doe.

| Defendant | Internet Protocol Address (IP) | Internet Service Provider | Defendant's City | Defendant's State |
|---|---|---|---|---|
| 1 | 107.2.17.46 | Comcast Cable | Tucson | Arizona |
| 2 | 174.18.32.144 | Qwest Communications | Tucson | Arizona |
| 3 | 174.19.185.214 | Qwest Communications | Mesa | Arizona |
| 4 | 174.26.136.158 | Qwest Communications | Tempe | Arizona |
| 5 | 174.26.150.208 | Qwest Communications | Tempe | Arizona |
| 6 | 174.26.156.248 | Qwest Communications | Mesa | Arizona |
| 7 | 174.26.95.50 | Qwest Communications | Phoenix | Arizona |
| 8 | 24.251.192.225 | Cox Communications | Scottsdale | Arizona |
| 9 | 24.251.194.199 | Cox Communications | Scottsdale | Arizona |
| 10 | 63.230.195.27 | Qwest Communications | Phoenix | Arizona |
| 11 | 63.230.203.214 | Qwest Communications | Scottsdale | Arizona |
| 12 | 67.1.11.97 | Qwest Communications | Tucson | Arizona |
| 13 | 68.0.167.226 | Cox Communications | Tucson | Arizona |
| 14 | 68.104.196.226 | Cox Communications | Scottsdale | Arizona |
| 15 | 68.110.118.96 | Cox Communications | Chandler | Arizona |
| 16 | 68.110.127.70 | Cox Communications | Peoria | Arizona |
| 17 | 68.110.83.80 | Cox Communications | Phoenix | Arizona |
| 18 | 68.2.172.29 | Cox Communications | Phoenix | Arizona |
| 19 | 68.2.192.32 | Cox Communications | Phoenix | Arizona |
| 20 | 68.2.25.132 | Cox Communications | Chandler | Arizona |
| 21 | 68.225.193.130 | Cox Communications | Tempe | Arizona |
| 22 | 68.225.196.20 | Cox Communications | Chandler | Arizona |
| 23 | 68.227.249.86 | Cox Communications | Phoenix | Arizona |
| 24 | 68.228.42.103 | Cox Communications | Tucson | Arizona |
| 25 | 68.230.24.109 | Cox Communications | Phoenix | Arizona |
| 26 | 68.230.67.26 | Cox Communications | Tempe | Arizona |
| 27 | 68.231.70.100 | Cox Communications | Scottsdale | Arizona |
| 28 | 68.231.92.41 | Cox Communications | Phoenix | Arizona |
| 29 | 69.244.44.177 | Comcast Cable | Tucson | Arizona |

Exhibit D.
Listing of the Believed State of Residence for Each John Doe.

| Defendant | Internet Protocol Address (IP) | Internet Service Provider | Defendant's City | Defendant's State |
|---|---|---|---|---|
| 30 | 70.162.240.46 | Cox Communications | Chandler | Arizona |
| 31 | 70.162.81.120 | Cox Communications | Tempe | Arizona |
| 32 | 70.164.248.120 | Cox Communications | Tucson | Arizona |
| 33 | 70.176.15.188 | Cox Communications | Scottsdale | Arizona |
| 34 | 70.176.51.56 | Cox Communications | Scottsdale | Arizona |
| 35 | 70.184.75.68 | Cox Communications | Tucson | Arizona |
| 36 | 70.190.127.16 | Cox Communications | Scottsdale | Arizona |
| 37 | 70.190.166.97 | Cox Communications | Tucson | Arizona |
| 38 | 70.190.36.132 | Cox Communications | Phoenix | Arizona |
| 39 | 70.190.38.161 | Cox Communications | Surprise | Arizona |
| 40 | 70.59.229.203 | Qwest Communications | Phoenix | Arizona |
| 41 | 71.209.177.64 | Qwest Communications | Phoenix | Arizona |
| 42 | 71.226.59.77 | Comcast Cable | Tucson | Arizona |
| 43 | 71.228.152.137 | Comcast Cable | Tucson | Arizona |
| 44 | 72.201.72.46 | Cox Communications | Glendale | Arizona |
| 45 | 72.208.10.168 | Cox Communications | Phoenix | Arizona |
| 46 | 72.208.154.3 | Cox Communications | Avondale | Arizona |
| 47 | 72.208.35.14 | Cox Communications | Tucson | Arizona |
| 48 | 72.211.159.222 | Cox Communications | Gilbert | Arizona |
| 49 | 72.223.77.241 | Cox Communications | Gilbert | Arizona |
| 50 | 98.165.174.49 | Cox Communications | Sun City | Arizona |
| 51 | 98.165.235.36 | Cox Communications | Chandler | Arizona |
| 52 | 98.165.75.199 | Cox Communications | Phoenix | Arizona |
| 53 | 98.165.84.104 | Cox Communications | Phoenix | Arizona |
| 54 | 98.165.88.115 | Cox Communications | Tempe | Arizona |
| 55 | 98.167.148.47 | Cox Communications | Goodyear | Arizona |
| 56 | 98.177.248.40 | Cox Communications | Phoenix | Arizona |
| 57 | 98.225.101.24 | Comcast Cable | Tucson | Arizona |